SAMUEL L. LEDERER

*v.*

JOHN YULE, SR., et al., surviving executors and trustees under the will of David L. Lederer, deceased, et al.

[Decided January 28th, 1904. Filed July 9th, 1904.]

1. A misrepresentation by a seller of a patent right will not entitle the purchaser to rescind unless it amounts to an untrue statement of some present fact, and a mere promise or prediction is not sufficient.

2. In a suit by the purchaser of a patent right to a burglar alarm to set aside the sale on the ground of misrepresentation, evidence considered, and *held* sufficient to show that the seller had falsely represented that a device equally reliable with the sample exhibited by him could be made for a certain price, on which representation the purchaser relied.

3. Plaintiff purchased of defendant a patent right, and at the same time assigned it to defendant as part security for a loan, the same being also secured by a mortgage and a life policy on plaintiff's life. By arrangement with the insurance agent, plaintiff was to have a cash rebate on the first premium on the policy, and by arrangement between the parties the rebate was to come to him through defendant.—*Held*, that plaintiff's subsequent insistence on payment to him of the rebate by defendant did not amount to an affirmance of the contract of sale, which, as a matter of fact, had been induced by false representations of the seller.

4. Where one who had purchased a patent right, in reliance on false representations of the seller, sought, about a month later, to induce him to take back the patent, but he refused to do so, in a subsequent suit by the purchaser for rescission plaintiff should not be compelled to make any compensation for depreciation in the value of the patent owing to lapse of time.

On final hearing on bill, answer and proofs.

*Mr. William J. Briody* and *Mr. William B. Gourley,* for the complainant.

*Mr. Jacob W. De Yoe, Mr. Gustav A. Hunziker* and *Mr. Miller* (of the Pennsylvania bar), for the defendants.

PITNEY, V. C. (orally).

This cause was argued the day before yesterday, and I have since read the evidence, and I think that I can dispose of it now as well as to hold it.

I do not think there can be any serious dispute about the law applicable to it, and the facts, I think, are sufficiently clear, so that I shall be no more liable to fall into error by deciding it now than I would if I should hold it.

The suit is brought by Samuel L. Lederer, a resident of Paterson, this state, against the trustees of his father's will and against Nellie McCrea.

The contest is between the complainant and Nellie McCrea, who lives with her father, John McCrea, at Chestnut Hill, a suburb of the city of Philadelphia. The real defendant is the father, John McCrea.

The contract which is called in question by the bill was made with John McCrea, and while the obligation from which the complainant seeks to be relieved was made nominally to Nellie McCrea, yet she took it with notice of and is chargeable with every equity complainant has against it, if any. There is no dispute but that the case must be decided according to the merits as they stood and stand between the complainant and John McCrea.

The particular obligation from which the complainant seeks to be relieved is a promissory note (in the shape of a judgment note) dated December 20th, 1900, executed by him to Nellie McCrea, for $9,000, payable in three years, and secured by a mortgage on the complainant's interest in his father's estate, which is a life interest merely, and the effect of the mortgage was to assign in advance his annual income under his father's will arising from the corpus of his father's estate.

As additional security for that obligation the complainant procured to be issued a life insurance policy for $10,000 on his life, payable to Nellie McCrea. He also assigned to her the certain letters-patent which had been at the same time assigned to him by John McCrea.

The consideration of the judgment note was $3,000 in cash,

advanced by John McCrea to him at the date of the obligation and the assignment to him of the letters-patent just mentioned.

The allegation of the complainant is that the letters-patent were assigned to him by John McCrea under such circumstances as that he has a right to rescind the contract and to be relieved of his obligation upon equitable terms.

Those equitable terms are, he says, that he should reassign the patent; that he should pay back to John McCrea, or Nellie McCrea, the $3,000 which he borrowed, and which he received, with interest, and that having done this he should have delivered up to be canceled the mortgage and have the policy of insurance so framed as to inure to his own benefit.

The contest, then, is over the validity of the deal or contract by which the complainant agreed to purchase from Mr. John McCrea the letters-patent in question.

Now, the allegation of the complainant is that that sale by McCrea to him of the letters-patent was procured by misrepresentations of fact; also, as he alleges, by misrepresentations of the value and the prospective profit to be derived from the ownership of the letters.

Now, the law on that subject is, I think, as I remarked at the start, thoroughly settled.

There must be proof that the vendor made some untrue representation of a matter of fact—present fact. The cases cited by counsel of complainant of transfers of patents indicate a disposition on the part of the courts to include in the classification of misrepresentation of present facts many matters which can hardly be brought strictly within that category, and the temptation to judges to do that is very great, and they sometimes call a misrepresentation of present fact what is nothing more than a promise of what will occur hereafter, a prediction in the nature of a speculation. But I take the law to be as I have stated it. There must be a misrepresentation of a present fact, or of a fact which though not immediately present will be in the future, and the principal matter dealt with in such cases is the cost of the patented article—what it will cost to manufacture it—which is

what may be termed a continuing fact, and not a mere prediction of results.

I say the disposition of courts is in that direction, because, as everybody knows, the putting on the market and sale of patent rights is one of the means by which persons of not over good sense of right and wrong have heretofore in many cases deluded persons of weaker mind out of a good deal of money; they have made rosy predictions as to what could be done with the patent; that it would do this, and that and the other, and have deluded people in that way, so that the selling of patent rights, at one time, was a notorious branch of the business of getting money without giving an equivalent for it.

But, as I said, I think the law in New Jersey, as it stands, must be confined to this—there must be a misrepresentation of a present continuing fact as distinguished from a mere prediction of speculative results.

Now, applying that law to the facts, we come to this:

Mr. John McCrea, in the month of October, 1900, was the owner of a patent for the manufacture and sale of what is called a burglar alarm and door check. Samples of the device have been handed up and were carefully examined during the production of the evidence to the court, and I have two or three of them in my hands at this moment. The article is somewhat of the character of a gun lock—is of a wedge-shape—so that when placed just before a door or behind it—I do not know which is the proper expression—in such position that when the door is opened the bottom of it will slide up on the inclined plane and will spring a lock, or the catch of a lock, which will act like a trigger and release the hammer, which in turn strikes against the end of a blank cartridge and creates a slight explosion, which is supposed to alarm the people in the house, and also, perhaps, scare the proposed burglar.

I say that Mr. McCrea was the owner of this patent. It was a recent affair, and he had procured to have made up two different working models or actual productions of the patent—that is, two kinds—one made of cast-iron, which is called throughout the case the cast-iron model, and the other made of sheet-steel.

The one is cast in a mould—the greater part of it—the springs being made, of course, by a different process, and after being cast in a mould is smoothed off and partly burnished with nickel— I think nickel-plated.

The other is made of sheet-steel, the parts being stamped out by a stamp and fastened together with rivets and screws—mainly rivets, I believe; there are one or two screws in it. The two products are in appearance very much alike, but when you come to examine them carefully they are quite different in some very material respects, as I think, and found when under examination during the production of the evidence.

McCrea found the cost of manufacturing the cast-iron alarm considerably greater than that of manufacturing it out of sheet-steel, and it is an admitted fact in the case. He applied to a manufacturing concern called the Woodbine Company, located at Woodbine, New Jersey, to see at what price they would manufacture a lot of these sheet-steel ones. He had also, however, had a good many manufactured in Philadelphia—some three hundred, I think, in round figures—of the cast-iron, and a less number of the sheet-steel.

Now, I notice, in reading the evidence, a little confusion on that subject. At one place it seemed to be admitted that the number of the sheet-steel which he had manufactured at the time mentioned was greater than those of the cast-iron. But the contrary is the fact.

In October, 1900, that was the situation of affairs. He had put a few of the cast-iron ones on the market and had a lot of them ready for the market, and a few of the steel ones. I do not recollect that the evidence shows that he had put any of the steel ones on the market.

Mr. McCrea had a friend in New York—a Mr. Lodge—an elderly gentleman, who was in the same business, so to speak, with McCrea, but was really nothing but a broker, and Mr. McCrea wrote him a letter, on the 17th of October, 1900, in which he informs him that he owns this patent. He says: "I send you by mail a sample of a burglar alarm and door check that I own the patent on, which has considerable merit." Then

he goes on to suggest that Mr. Lodge should assist to put it on the market—to make a sale of the whole thing. The material point in that is that he says he sent the article as a model or a "sample"—that is the word he uses—of the article of which he holds the patent. The sample actually sent was of cast-iron. He also says that they can be manufactured from sheet-steel. "The one I send you is cast-iron and it only weighs four ounces, I can have them made in large numbers for nine cents each." Now, I am not quite sure whether, by a correct construction of his language, he referred to the cast-iron or the sheet-steel, but he says he can have them made for nine cents each. I think somewhere else he says in the correspondence that the cast-iron ones cost twenty-five cents. But he says that they could be sold to agents at twenty-five cents, who would in turn retail them at fifty cents. Here he undoubtedly referred to a cost of nine cents. He proceeds:

"Suppose there were agencies opened in all the large cities of the country, simply places where agents could be supplied in that way, one thousand canvassers could be selling; and suppose each would only sell five a day, that would be five thousand, at a profit of sixteen cents each, or a net profit of nine hundred dollars per day."

That profit is to the owner, but if the agent sold them at fifty cents, and made twenty-five cents, it would be $1.25 a day to the agent.

Then he goes on (in the letter of October 17th) to say he will sell the whole thing, with the tools and all, for $5,000, and he says he will allow Mr. Lodge twelve and one-half per cent. commission—that would be $625.

Now, two or three days later he wrote Mr. Lodge again, and there is no date on that letter, but it acknowledges one of the 19th from Lodge. In it he says he will send him two more of the alarms, and it is admitted he did send one more, and the clear weight of the evidence is that such second shipment was also a cast-iron one. Mr. Lodge's evidence is clear on the subject, and I read Mr. McCrea's evidence on the subject carefully, and he does not say that he has any confidence in the idea that

the next one he sent him was a steel sample. He then also states that he thinks he can have them made for eight cents each, and in both the letters he praises it up highly—tells what great profits there is to anybody who owns it.

Now, about that time Mr. Lodge came in contact with the complainant herein. The complainant had borrowed on his interest in his father's estate a sum of $600 or $800 from a Philadelphia gentleman by the name of Deacon through the brokerage of a Mr. Paul Smith of New York City, a broker who had an office in the same building with Mr. Lodge, and he called to see Mr. Smith about getting more money. Mr. Lederer was a gentleman who seemed to be in a chronic state of impecuniosity. The income of his father's estate was not sufficient for him, and he was doing what, I suppose, his father, if he had anticipated he could do, would have prevented him from doing, by putting in his will a clause against anticipation of the income of his estate—Mr. Lederer was trying to borrow more money through Mr. Smith, and there he accidentally met Mr. Lodge. Mr. Lodge says, "Here, don't you want to buy this patent?" He submitted to him one of these cast-iron samples. "No," Mr. Lederer says, he didn't want that; he wanted to borrow more money. "Well, perhaps I can help you," Mr. Lodge says, and negotiations were entered into between them which finally led to the contract in question.

Now, on the 22d of October Mr. McCrea received from the Woodbine Company, of which a Mr. Bayard was president, a letter in which they give him prices on the door check and burglar alarm "according to the sample furnished us," and they are willing to sell in lots of five thousand at seven and one-quarter, ten thousand at six and three-quarters, twenty-five thousand at six and two-fifths; fifty thousand, six; one hundred thousand at five and four-fifths cents each; the man who orders to keep in order the dies from which they were cut out. The sample shown the Woodbine Company was admitted to be the sheet-steel sample which Mr. McCrea had had made in Philadelphia. And I may as well say here that Mr. McCrea says (and I do not doubt its truth) that he himself invented a little

addition to this burglar alarm in the shape of an attachment which would enable it to be attached to the casing of a window, so that when the window was raised it would have the same effect on the alarm as it would if the door was opened on it. I stop to say that I think that shows good sense on the part of Mr. McCrea, because a burglar alarm on a door does not amount to much. Burglars do not generally get in that way. It is easy enough to bolt a door so a burglar would not go in through it, but the window is the point of attack.

This sample given to the Woodbine Company was, as I understand it, one with this window attachment on one side. I will say something about that window attachment further on.

Now, going back. Having received this letter from Woodbine, Mr. McCrea immediately mailed it to New York, to Mr. Lodge, in a letter which is here before me:

"I have yours of yesterday. No doubt this young man's estate [that is, Mr. Lederer—showing how far the thing is advanced] is worth all you say. * * * I wrote you I could have these alarms made for nine cents, but you see by the enclosed letters they can be made for less than six cents, or a third less, which makes the alarm worth a third more; but inasmuch as I named the price for it before I knew this, I won't increase it; but if your client wants to buy he will have to move quickly, for be sure anything showing the profits this does won't be for sale very long at this price. Why, look at it. It is a patent article, controlled absolutely by the owner; can be had by no one else, can be sold for cash; therefore, no capital is required. You can sell to the canvassers for cash [he did not interpolate, if they would buy]. Go on and get this, and suppose you sold ten thousand a day, that would be $1,900; and if it is pushed this can be done without doubt in sales to agents and to the hardware and novelty stores."

Now, those are the letters. And another one, of October 25th, in which he goes on to state:

"The nicest part of the burglar alarm business is it practically takes no money to run it. You get thirty days' time from the manufacturer, and long before that time is up you have them sold and have received not only the six cents they cost, but nineteen cents profit besides. Just let a live man go out with one of these to solicit orders of from twenty to a hundred—from hardware stores, novelty stores, house-furnishing stores, and I believe segar stores and news stands would sell them, and let him use

blank cartridges liberally to illustrate what he has for sale—he won't be much of a salesman if he don't sell 1,000 a day. A few men could be used disposing of them in a wholesale way like this, while thousands could be employed as canvassers."

Now, the cast-iron samples and the parts of those letters which were pertinent to advance the sale, together with this letter from Woodbine, were shown by Lodge to Mr. Lederer. Mr. Lodge swears that he showed Lederer such or so much of the letters as was prudent—I forget the language he uses—used proper discrimination, according to the circumstances. And this, with the cast-iron sample, was all displayed to Mr. Lederer, and it does not appear at all that he knew anything about those made of steel plates, or that he considered the difference in the probable working of them.

I stop here to say that the sample of the steel plates which was handed to the Woodbine Company—that is, one of a few that Mr. McCrea had made in Philadelphia—was an article which on a slight inspection you would not notice was in anywise different from the cast-iron one, except in the attachment for the use on the window.

Now, these are the representations that were made to Mr. Lederer as to the cost of these machines. And the first question, and perhaps the only question, is whether Lederer had a right to believe from these representations that the cost of some six to nine cents each which is stated by Mr. McCrea in these letters, and which representation in the letters were communicated to him by Mr. Lodge, referred to the cost of the cast-iron one; or, even if he knew that it referred to the cost of the sheet-steel one, of which I find no proof, whether it did not amount to an assertion that the sheet-steel ones were just as good as the sample—just as workable in practice. That question was argued, and it was strongly argued, before me on both sides, and perhaps the conclusion I come to on that single question settles this case.

Now, I am of the opinion, after reading the correspondence, after hearing the evidence of Mr. Lodge, that Mr. Lederer was justified in understanding that the cost mentioned did apply to the cast-iron sample, and that the sheet-steel product was

equally valuable, equally durable—equally reliable is the better word—reliable in daily use with the cast-iron samples. No distinction is made by Mr. McCrea in his letters. He does not say a word to indicate that the sheet-steel one would not be as good as the cast-iron in every respect. He puts the cast-iron one forward as a sample. Now, he says in effect to Mr. Lederer: "Try that and see how it works; examine it; put it out; go around and canvass with it. I can get sheet-steel ones made for six cents." Admit now that the assertion as to cost was confined to the sheet-steel article. Yet, is not that tantamount to saying in so many words that the sheet-steel is just as reliable—it will snap every time, it will explode the cartridge, and all that? Does it lie in his mouth to say, "Why, I told you the letters show that those that could be bought for six cents each are sheet-steel," and at the same time say, and be allowed to say, that he did not mean to have Mr. Lederer understand that they were equal in all respects to the cast-iron sample which he sent him? Now, I think it would be a reproach to the administration of justice to say that Mr. McCrea could put himself in that position.

I feel constrained to say that the net result of the representation made to Mr. Lederer through Mr. Lodge was this: that even if his attention was called to the fact, and I doubt it very much, but assume that Mr. Lederer's attention was called to the fact that the article, which was to be made for from six to nine cents, was a sheet-steel article, yet that that representation assumed, and must be held in law and morals to assume, and in fact did assume, that the sheet-steel article was precisely as reliable and valuable an article as the cast-iron one.

Now, Mr. McCrea swears, and it is true, that in the course of his negotiations Mr. Lederer came to Philadelphia on the 3d of December, 1900, and that they had a personal interview; and that is the first personal interview that they had; and that at that interview he showed Lederer a sheet-steel sample and explained to him that. Now, if I recollect right, Mr. Lederer denies that his attention was called to any sheet-steel alarm at all. I do not think it at all important to settle that question. The fact is that Mr. Lederer's attention was not engaged in that

direction at that time. He did not go to Philadelphia for that purpose. He went there—although he does not directly admit it—he went there, as McCrea swears, and as is the truth, for the purpose of being examined for a life insurance policy, to be taken out to go as additional security for this $9,000 note, and he was there subjected to the plausible and insinuating talk of Mr. McCrea, who was anxious to hold him to the verbal bargain already made between him and Mr. Lodge for the contract which was finally consummated on the 20th of December. Mr. McCrea was anxious to hold Mr. Lederer up and not have him fly his bargain.

Mr. Lederer swears that McCrea told him at that interview that he would find and furnish a man who would sell a hundred thousand of these alarms in I don't know how short a time. Now, Mr. McCrea denies that assertion, but he admits distinctly in his evidence that he did tell him that he knew of a man—I think that is the language—some man whom he mentioned that could do it. The only difference between him and Lederer is that Mr. Lederer thinks he *agreed* to furnish him, and Mr. McCrea says he only told him there was such a man to be had.

Now, the difference, so far as that goes, is very trifling, and, as I remarked during the argument, it is very plain from Mr. McCrea's own evidence that he was doing everything he could to put this thing to Mr. Lederer in the most rosy light, with all sorts of rose-colored predictions as to the great fortune he was going to make out of it, and was practicing all the arts of a patent seller on him at that time. And if he showed him the sheet-steel one, I must presume that he showed it to him as an article that was equal to the original sample he had sent to New York to sell by, and Mr. Lederer, I repeat, had a right to say, "Here is the sample; I want this or something just equally good."

Therefore, I decide against the defendant on that point. I find as a fact that the representation was that an article, the same precisely as the original sample, or one entirely equal to it— equally reliable—could be manufactured from six to nine cents, according to the number ordered. And the only effect I give to

the rosy predictions of Mr. McCrea is that Mr. Lederer was the kind of man who was liable to have his mind diverted from the real matter to which he ought to have directed it by these blandishments, I call them, of an adroit seller. And Mr. McCrea was not in the business of giving Mr. Lederer much time for cool thought, even if Mr. Lederer had been capable of it. And I may repeat here what I said in the argument, and I say it with great respect to Mr. Lederer, since I have to deal with the facts, that it was perfectly evident that his father, when he tied his property up, knew what he was about. He is improvident—honest and sober; I don't see any signs of spendthrift—but he is actually defective in business qualifications. His correspondence shows it. He needs a guardian all the time—that is the fact of the matter—to take care of him in pecuniary matters.

Now, that is the representation on which this sale was made, and that the cast-iron alarms cannot be made for the sum named is an admitted fact in the case. The experts vary in their estimates from twelve and a half to twenty cents in large quantities.

Let us go a little further with the history of the case. The preliminaries in regard to arranging—ascertaining on the part of Mr. McCrea the value of the estate of the elder Lederer, and its present situation, construction of the will, the rights of Mr. Lederer under the will, and procuring the policy of life insurance, and all that—was attended with a great deal of detail and with great care on the part of Mr. McCrea. He lost no point there. And, of course, that I do not remark as anything against him.

The parties came together on the 20th of December, 1900, at Paterson. The assignment of the patent to Mr. Lederer was executed by McCrea; then an assignment of the patent from Lederer to Miss McCrea—absolute assignment—with defeasance, so he had no present actual control over it. The assignment by way of mortgage of the interest in the estate was executed and the judgment note for $9,000 was executed and delivered to Mr. McCrea for his daughter, and I think there was a contract entered into—I don't think it cuts much figure here—by which Mr. Lederer should not only pay the interest on this $9,000,

but should pay $100 royalty every year to Miss McCrea, as if she were the owner of the patent and it had not been sold to him —something of that kind.

Mr. Lederer was attended by Mr. Wood McKee as his counsel, who saw that the affair was put through according to his previous contract; but Mr. Lederer was foolish enough to go into this affair without taking the advice of any man of any business sense, and I cannot help but think and believe that Mr. McCrea knew that any man that would believe all the praises and air-castles of money-making that he put forward on the strength of this patent was what we call an "easy mark." Immediately after the thing was through, Mr. McCrea informed Mr. Lederer that he had entered into a contract with the Woodbine Company to manufacture ten thousand or more of these articles, and that he would turn that contract over to him. Mr. Lederer, with juvenile enthusiasm, made his way down to Woodbine and saw Mr. Bayard, the German president and manager of this concern, and found he had a few alarms stamped out, but none of them put together, so he could not judge of their character from seeing the parts; but he agreed to take the contract off McCrea's hands, and told Bayard, "Now, you send me some as soon as you can." That was somewhere the latter part of December or first of January. At the same time Lederer purchased of McCrea the stock of manufactured articles he had on hand, and he showed considerable capacity—Jewish capacity—in that respect, because McCrea had no right to sell them, but he had them on hand and Lederer bought them of him at seven cents each, and there were about three or four hundred of them altogether, and two-thirds of them were cast-iron and about one-third of them steel.

Now, Mr. Lederer at once set himself about selling these affairs, I think, with proper industry. He advertised the alarms and soon got correspondents who asked for samples, and he sent to them, in every instance, the cast-iron ones. He had them in greater number, and I do not know but that he began to suspect that the cast-iron ones were the best ones to put forward. But finally, in the latter part of January, came a consignment from

Woodbine of twelve of the sheet-steel ones, and he had before seventy-nine from McCrea. He sent out the cast-iron ones for samples and when the order came for a lot to try them, sent out the sheet-steel ones. Now that, I think, was right, because if he was expecting to sell sheet-steel ones he ought to do it at the start, and he had ordered I don't know how many thousand from the Woodbine Company. He could not supply any great quantity of these cast-iron ones; he only had two or three hundred of them. He could supply any quantity of the steel ones as fast as he could get them.

But he says—I don't know whether he went to Woodbine twice or not—but he swears—and I think it must be held to be undisputed in this case, because it was not disputed by Mr. Bayard—that at one of the interviews with Mr. Bayard at Woodbine, which occurred at or about that time—perhaps it was the only interview he had—he asked Bayard whether he could not manufacture these cast-iron ones, and Bayard said no. Of course, Bayard could not make them for any six to nine cents apiece; but Mr. Lederer interpreted, and I think he was justified in interpreting his language, and it must stand as an established fact in the case, because not disputed by Mr. Bayard, that Bayard declined to undertake the manufacture of the cast-iron ones on any terms—it amounts to that—any terms that Mr. Lederer would be apt to accept.

Now, Bayard undoubtedly knew, because Lederer told him that he had gotten an assignment of the contract from Mr. McCrea, and he knew what terms it was on—here is his letter—and Bayard knew he could not manufacture these cast-iron ones for any such sum of money as that, so Mr. Lederer was justified in thinking and believing that he could not get the cast-iron ones made. He sent out for actual use the best steel ones; the first ones undoubtedly which he sent out. According to the correspondence—I am not going into the details, but I looked that over carefully, and if you look at it you will find that he must have sent out a lot of the sheet-steel articles before he got any considerable quantity from Woodbine. The correspondence shows that, and the letters he received in reply show that they

could not have been manufactured at Woodbine, for, as I say, he only got about a dozen of them in the latter part of the month of January—the others came later; he sent out all of those out of the Philadelphia made ones, and they came back on him immediately, the purchasers saying they were not the same thing as the cast-iron ones.

And he tried them all over Passaic county and its neighborhood—himself and brother. They went to stores, went from house to house and traveled around there and tried to introduce them; they found these steel ones would not work, a good many times they would not explode—did not work at all—they could not sell them.

Then it is very evident that he went to Mr. Lodge—he naturally went to Mr. Lodge. Mr. Lodge was the gentleman who had induced him to go into the bargain. I will stop right here now to say—which I omitted at the proper place, but it is very proper to bring it in here—Mr. Lodge had the right to sell that patent for Mr. McCrea at $5,000 and have a twelve and a half per cent. commission. He actually sold it to Mr. Lederer for $6,000, and he was interested in the success of the enterprise to the tune of $1,625; and the extra $1,000, he says it was understood from the start, he was not to have unless Mr. Lederer succeeded. And I will stop here to say that Mr. Lodge is the one truthful witness in this case that I can rely on absolutely for two reasons—*first,* I think he is thoroughly honest, and *second,* he is sufficiently intelligent to know what he is swearing to, and I think he is swearing apparently against his own interest.

Now, Mr. Lodge swears that he took pains to assist Mr. Lederer in exploiting this thing, and helped him all he could, for he was interested in so doing. But he soon found what the trouble was; he found it was twofold—*first,* defect in the instrument itself, and *second,* defect in Mr. Lederer's business capacity; and that defect in Mr. Lederer's capacity, I repeat, was just what Mr. McCrea ought to have expected in a man that would take in all the foolish predictions that he made about this contrivance, and act on them, and buy this thing under the circumstances. Mr. McCrea ought to have known

Lederer was not a man who had wits enough to put a thing of this kind on the market.

Now, Mr. Lodge writes to his friend, Mr. McCrea, on the 26th of January, 1901, that Lederer was after more money. The $3,000 which he had got had been spent—first, in paying the $600 or $800 he already owed by a previous mortgage to Mr. Deacon, of Philadelphia; second, in paying debts that he had incurred; that is clearly stated by Mr. Lodge that that was the understanding; and he wants more money to push the thing. Mr. McCrea's rosy statement how it could be done without any capital—that I think really goes to the extent of being amusing—the statement how it could be done without any capital did not realize, and Lederer says, "I must have more money," and he was talking to Lodge about more money, and Lodge had been writing, I think, to Mr. McCrea about it, but this is what he says January 26th, 1901:

"I am anxious about the matter which I wrote you in the Lederer matter. I saw my party to-day, whom I can arrange to loan Lederer the money, provided you are satisfied and want to close the matter out."

That was the proposition, to buy McCrea off. The letter proceeds:

"He received a shipment of twelve alarms from the Woodbine people as samples. *They are not right; four are so weak that they will not fire off, and the others are so arranged they go off too easy.* Lederer thinks he will have them made at home, although they will cost more. To tell you the truth, I am afraid, for want of a little money, he can't do much business; it is not in him to do business on a large scale. Anything I can do for you, all you have to do is to mention it."

Then another matter in the letter is about Lederer finding fault with McCrea for holding back some money on the insurance matter. And I must stop here to say just what that was, because I do not think it cuts any figure in this case at all— I have nothing to do with it. The agent in Philadelphia who negotiated this life insurance was entitled to a certain percentage—pretty large and liberal percentage—from the Mutual Life of New York, and he agreed to divide that with Lederer

in some way, so that Lederer had, after paying the whole money, a right to a rebate in cash, but that rebate was to come through McCrea, and Lederer was constantly pressing for it. Now, I stop to say that Lederer's demand for that money was no affirmation of this contract, and any pushing by him to get that money had nothing to do with this contract; that insurance, although issued to Nellie McCrea, belonged to Lederer in equity, and the money he got back was such that he was entitled to it absolutely, whether this contract about the burglar alarm went through or not— whether it was completed or not—and his pushing his claim for that rebate was no affirmance of the contract.

Then, in the same letter I have quoted from—January 26th— in the latter part, Mr. Lodge goes on to say:

"He [that is, Lederer] says everything seems to go back on him, and he finds the alarms won't sell fast. If he was any kind of a hustler he could make a nice living out of it, but for making much money, it is not in him. I am very much disappointed. If he would only attend to matters and do as I want, I could have sold the N. Y. rights which I wrote you about, *but he must have them made perfect*, then there is a possibility of me doing something. Wishing your recovery, I am, yours, &c."

There he complains that the samples that Lederer had got were imperfect, would not sell, would not work, would not go off—some too quick and some not at all—finding fault generally.

Now, that is a very important letter. It was put in by the defendant, and it is a very important element in the disposition of this case. That is January 26th.

On January 30th, 1901, Mr. Lederer writes to McCrea, and after dunning him for the insurance rebate, says: "I am thoroughly disgusted with my bargain about the alarms, and find it is impossible for me to introduce them, *as I cannot get them made right."* Now, put that alongside of Mr. Lodge's letter, in which he says he cannot sell anything until he gets a perfect machine, and we see that they correspond, and we see that—take the two together—that they were a notice to Mr. McCrea of the deficiency of the article, and were substantially an asking for rescission.

Now, Mr. Lederer (March 6th) writes again to McCrea, and asks for an interview, saying:

"I have written to Mr. Lodge, and he told me you·had gone out of the city. Will you please let me know if you will be in town on Monday or Tuesday of the coming week, as I wish to have a talk to you and see you in some matters about the alarm?"

Now, Mr. McCrea knew what that meant. He had had a letter from Mr. Lodge—which was a very plain one—and he had a previous letter from Mr. Lederer in the same line, and he wrote, on March 7th—this is a very important letter, because it accounts for subsequent conduct—to Mr. Lederer:

"In reply to your favor of the 6th inst., would say, I will be at my office in this city on Monday, 11th inst., up to two o'clock P. M., at which hour I return to Atlantic City, and will be pleased to see you from 9 :30 up to that hour. Lest you should be put to unnecessary trouble and expense in coming to urge what Mr. Lodge suggested in his letter [now, I don't know what letter that refers to, but there was undoubtedly a letter from Mr. Lodge to Mr. McCrea suggesting a settlement], namely, *that I take back my patent. * * * Let me say to you that owing to my impaired health I would be unable to put this invention on the market and give it the attention it ought to have; therefore I would entertain no proposition whatever of that kind.* Of course I would accept at any time the amount of your note."

Now, there is an absolute refusal to treat for a settlement of this thing by rescission of the contract on any terms. There are other letters from Mr. Lodge, but I have not referred to them this morning; I only referred to the fact of the defect in the machines. The defect in the sheet-steel ones was pointed out to Mr. McCrea by both Lodge and by Lederer, and in the face of that he refused, positively, to come to any accommodation.

Now, as I have said, the defect must have been developed, first, not in those made by the Woodbine Company, but in the seventy or eighty that had been made by Mr. McCrea, and one of which was sent to the Woodbine people as a sample, and those were made undoubtedly with great care, and you can see a plain difference in them. The original sample of the sheet-steel one was examined by me carefully. I have it here in my hand now.

I compared it in all its details with the cast-iron one, as you recollect, when the case was in progress, and I recorded my opinion of them. I read it last night, and I have not changed it—the cast-iron one is decidedly the superior article in all its details. Next in order of merit comes one of the original lot—seventy-eight or seventy-nine manufactured by some concern in Philadelphia for Mr. McCrea before he sold this patent. And next in order of merit comes those manufactured by the Woodbine Company—part of the ten thousand contract.

Now, I want to repeat that those sent out for use and sale by Mr. Lederer were part, undoubtedly, of the seventy-eight received by him from Mr. McCrea, and were the best samples that could be made of sheet-steel, and they failed to work, and anybody looking at those can see—anybody with a half me-. chanical eye—can see that they could not be made of sheet-steel to be equal to that cast-iron sample. And, further, I read the evidence last night with care of one of the Paterson experts. The stenographer took all he could of it, but there was a running conversation between me and the expert as to the difficulty, and the reasons why the one made of sheet-steel could not be made equal to that of cast-iron, and I think that such was decidedly the opinion of the expert, and it was my opinion as a juryman and something of a mechanic.

Now, one word with regard to the window casing attachment found in the articles made of sheet-steel.

In order to prevent the article from slipping before the movement of the door, it is provided with two sharp prongs or teeth placed on the bottom, the office of which is to penetrate through the carpet into the floor and hold it in its position.

The window attachment is a little projection on the side of the affair which, when placed and held in position by these two teeth to the window casing, would be struck by the rising window and produce an explosion precisely as would the door when placed on the floor.

The intrinsic difficulty with this operation is that a very little play in the sliding space of the window would enable it to slip past the projections, and the same result would follow a

slight lack of a sharp angle on the top of the window. Then the attaching of the alarm by its teeth to the window casing would mar the latter precisely as if a nail were driven therein, and that marring would be duplicated as often as the article was removed in order to raise the window.

My examination of the attachment led me to the conclusion that it added nothing to the value of the article.

Now, I come back to the situation after Mr. McCrea positively declined to treat for a settlement. What did Mr. Lederer do? A quarterly or semi-annual payment of interest was due from his trustees on the 1st of April, which would come to Miss McCrea under the assignment. It does not appear positively in the case, but you can read between the lines that Lederer notified his trustees not to pay her. He—foolishly, perhaps—thought he could defeat McCrea in that way, or drive him into some kind of a settlement. Now, I think that he had the right then, and in one sense it was his duty, to have filed a bill immediately; but Mr. Lederer was willing to see what he could do with the affair— see whether he could put the patent off on somebody else; see how he could extricate himself. He was not a man, as I say, with any business qualifications whatever, and it does not appear that he had any good friend with good business sense behind him to take care of him. He requested his trustees to refuse to pay. They refused to pay, and an angry meeting took place between Lederer and McCrea, in New York, in the month of April.

But I ought to stop here to say what my conclusion is as to one or two disputed matters of fact in the case, which I think are of no consequence whatever, however. One is the allegation by Mr. Lederer and Mr. Lodge that between the 3d of December, which was the day of Mr. Lederer's interview with Mr. McCrea in Philadelphia, and the 20th of December, when the affair was closed in Paterson, there was an interview between McCrea and Lederer in New York City. I think the clear weight of the evidence is that there was such an interview. Against it is put in a running fire of correspondence between the parties, and that, of course, is a circumstance; but it is a circumstance of more or less weight, according to the other circumstances. We

all know that letters go back and forth between parties, and the parties go at the same time—change their mind after they have written a letter. We have it in every-day experience. It happens every day that letters go at the same time the individual goes. I do not think it is of any consequence. It is only a question whether or not, before this affair was closed— the 20th of December—Mr. McCrea made any false assertions of fact to Mr. Lederer. Lederer swears that he made all sorts of statements, and McCrea denies them. And the truth is that Mr. McCrea did make all sorts of rosy promises and predictions as to what this alarm would do, and no doubt stated orally what was written in regard to the cost of them, although that is not emphasized much by Mr. Lederer. According to what Mr. Lederer says, McCrea promised to find a man to put money in the enterprise and promised to find a man to sell a hundred thousand a year. I think the truth is that McCrea said: "You can get all the money you want, and you don't want any money at all, and you can find a man who will canvass for you," and all that sort of thing—building air-castles more airy and unsubstantial than those they have in Spain.

One other matter in dispute was this:

Mr. Lodge swore, in substance, that he had never seen a sheet-steel alarm until after the completion of the sale, December 20th.

Mr. McCrea, on the contrary, swore that he showed a steel alarm to Mr. Lodge in October, at the house of the latter's daughter in Philadelphia. Mr. Lodge admits the interview, but says that it was in cold winter weather and after December 20th.

I think Mr. Lodge is the more reliable witness. But I also think that it is a matter of no consequence to this cause which is the more accurate in his statement, since it does not appear that Mr. Lodge took a steel sample to New York with him, or that if he did that he showed it to Mr. Lederer.

Now, I come back, then, to the conduct of the parties at and after April 1st, 1901. They had an angry interview in New York, which led to nothing. The suit was brought; it was defended; it was brought to trial, and many of Mr. Lederer's

letters and papers, which were handed over to Mr. Emley, the counsel for the trustees in that case, were destroyed by the Paterson fire, so I do not think that Mr. Lederer has a single letter here from Mr. McCrea. But the letters—the correspondence with Mr. Lodge—was not destroyed, but has been saved.

The suit went on with unvarying results. It was decided against the trustees at the circuit. They took it to the court of errors and appeals, and it was there affirmed. That occupied a matter of a year or so—the precise dates are unimportant. Finally judgment was rendered against the trustees on the first suit, and no leviable property, of course, was found, and they were hauled up on supplementary proceedings. Then things looked serious, and this bill was filed.

In the meantime there was a great deal of correspondence about settlement, and propositions to take more money or less money—or something of that kind—and Mr. Lederer seems to have thought if he could have got about $5,000 more he might accomplish something, but the fact was it was a desperate thing. If he had got the $5,000, it would have been the end of his interest in his father's estate; there would not have been anything left; he never could have extricated himself. Fortunately it was not accepted. He tried to drag in Mr. McCrea in various ways, but he failed, as one might expect.

Well, this bill was filed. I see nothing in the way of Mr. Lederer's equity. I think his allegation of misrepresentation, as a matter of fact, is established. It is not necessary to show any fraud whatever. It is a question whether or not Mr. Mc-Crea made a statement of fact that was not true and upon which Mr. Lederer relied.

Now, it is impossible to think that Mr. Lederer did not rely on the representation that these little affairs could be made at from six to nine cents each. It is palpable; it was the whole basis of Mr. McCrea's argumentation by which he induced him to purchase it. He says you can sell these things for fifty cents. Give the canvassers one-half, have them made for six cents, and you have got nineteen cents left for yourself. There it is, all in black and white; it was all laid before Mr. Lederer—a most

rosy view. I think he has not lost his right by any delay to a greater extent than can be saved on the terms imposed upon him. He must pay back the $3,000; he must pay the interest on it, of course.

Then, with regard to the depreciation in the value of the patent during the two years and two months. But there is just a single circumstance in the case that I think is a complete answer to that, and that is the letter of March 7th, written by Mr. McCrea to Mr. Lederer, in which he positively declines any kind of settlement based on the return of the patent. If he had done what equity required him to do, then he would have exchanged and got his patent back; and he would have been out of pocket just its depreciation in two months, or less than two months. He did not do it, but refused, and Mr. Lederer ought not to be compelled to make any compensation for the depreciation, if any, in the value of the patent due to the lapse of time. I do not want to say anything to injure the value of this patent. Mr. McCrea says it is a very valuable thing; he thought so then, and he thinks so now—worth now as much as it ever was. The depreciation, I repeat, of the value by that lapse is Mr. McCrea's own loss, and he must father it.

Now, just one other thing as to the terms, and that is the cost of the judgment and proceedings thereunder, which was recovered against the trustees. That, I think, Mr. Lederer must bear, and for the simple reason that I stated awhile ago—that he ought to have filed his bill at once, instead of putting up his trustees to fight. I won't say that there are not two sides even to that question, because Mr. Lederer was trying to find some plan by which he could dispose of the patent without loss, and he was entitled to a reasonable time for that. But I do not think that is sufficient to overcome the other consideration. The taxed costs of the judgment against the trustees, I think, he must pay, and I come to that conclusion with some regret, but still I think he must pay them. The defendant must pay the costs of this suit and a reasonable counsel fee, and that must come out of the $3,000 and interest which he must pay back.

I think the defence was entirely unjustified, but whether it

was or not, the decision is in favor of the complainant, and the statute entitles him to counsel fee, to be fixed by the court, and I think he is entitled to it.

Mr. De Yoe—Mr. McCrea paid out insurance money to keep up this policy.

The Court—He must have that back. The decree must provide not only for the cancellation of the mortgage, but Miss McCrea must do all acts necessary to have that policy vested in the name of Mr. Lederer. I do not suppose there will be any trouble with the insurance company. Whatever formalities Miss McCrea must perform in that regard she must perform.