(No. 23538.—

THE FIRST NATIONAL BANK OF CHICAGO *vs.* THE BRYN
MAWR BEACH BUILDING CORPORATION *et al.*—(HOL-
MAN D. PETTIBONE *et al.* Appellees, *vs.* BERNARD D.
HARRIS *et al.* Appellants.)

*Opinion filed February 12, 1937.*

SHULMAN, SHULMAN & ABRAMS, WARD, CRUTIS & POLIN, AARON SOBLE, and HENRY ABRAHAMS, (MEYER ABRAMS, of counsel,) for appellants.

MILLER, GORHAM, WALES & ADAMS, for appellees.

DON KENNETH JONES, and VINCENT O'BRIEN, for The City National Bank and Trust Company *et al., amici curiæ.*

Mr. JUSTICE STONE delivered the opinion of the court:

This cause is here to review the judgment of the Appellate Court for the First District affirming a supplemental order and decree of the superior court of Cook county which approved a sale of the involved mortgaged property and a plan for re-organization submitted by a committee representing certain bondholders. The Appellate Court has submitted the case on a certificate of importance, certifying that the question of jurisdiction of a court of equity in a case of this character is one of public importance, as to which the decisions of the Appellate Courts of the State are at variance.

The cause arises through a foreclosure proceeding brought by the trustee under a certain trust deed, against the mortgagor, the Bryn Mawr Beach Building Corporation. The trust deed was given to secure bonds aggregating $6,000,000. The property is a nineteen-story and basement apartment hotel, located at 5555 Sheridan road, Chicago, on a lot approximately 600 feet on Sheridan road by a depth of approximately 252 feet. The building contains a total of approximately 1549 rooms, composing apartments of various sizes and rooms used for other purposes. The building contains also a 170-car garage, swimming pool, dining room, barber shop, beauty parlor and commissary. With the exception of the lobby, restaurant, kitchen, dining rooms, a few apartments and a few other guest and maid rooms, the entire building is unfurnished. It was completed in the autumn of 1928.

The trustee, the First National Bank of Chicago, appearing here as appellee, filed the bill for foreclosure in a representative capacity pursuant to the provisions of the trust deed. It appears that on October 1, 1931, the mortgagor defaulted on payment of $200,000 principal of the bonds, and on December 12 thereafter the trustee, pursuant to the terms of the trust deed, took possession of the property and has since operated the same for the benefit of the bondholders. On December 17, 1931, the trustee, as it was authorized by the provisions of the trust deed to do, accelerated the maturity of all outstanding bonds and brought foreclosure. The decree for foreclosure and sale was entered on February 20, 1934. By it the master in chancery was directed, in case of failure to pay the bonds within a certain time specified therein, to sell the property, and, after deducting costs, fees and expenses of the proceeding, to pay the remaining proceeds to the trustee, the latter to distribute the same *pro rata* among the bondholders. In December of 1934 the court directed the trustee to pay the costs and expense of the foreclosure proceedings

from funds in its hands derived from operation of the mortgaged property, which was done accordingly. On January 11, 1935, the master published notice that the sale would be held on February 4 following. Notice was given accordingly. The sale took place on that date in accordance with the notice, and Harold C. Bull, acting for a committee of bondholders, bid in the property at the sum of $1,040,225. It appears that prior to the decree for foreclosure and sale a bondholders' committee of five members was formed at the instance of certain of the bondholders. This committee consisted of outstanding business men of the city of Chicago, but one of whom held any of the bonds and he but a small amount.

On January 28, 1935, one of the appellants, Charles Shapiro, on leave of court filed an intervening petition praying that the trustee be directed to bid at the sale, that the court determine the fair market value of the property, and that the trustee be directed to bid that value. He appeared on behalf of himself and other bondholders. David H. Brill was appointed by the court as attorney for non-depositing bondholders and appeared on behalf of such bondholders throughout the proceedings. The bondholders' committee on February 9, five days following the sale, asked leave to file an intervening petition, setting forth that it represented at that time $5,183,400 of the principal amount of the outstanding bonds; that it had caused Bull to bid at the master's sale as its nominee; that on December 18, 1934, it had promulgated a plan for the re-organization of the property, to be considered in connection with its bid at the foreclosure sale, and prayed that the court consider and approve such plan. The petition sets out that the committee had on December 18, 1934, sent to all the known depositing and non-depositing bondholders an explanatory letter and copy of the plan, urging them to deposit their bonds with the committee for re-organization purposes. This petition also prayed that the court supervise the consummation of

.the plan of re-organization if it be approved, and accord to all bondholders who had not previously deposited their bonds an opportunity so to do and thus to participate in the plan of re-organization. Leave was granted to file this petition, and process was issued to certain depositing bondholders as representing all those who deposited their bonds with the committee and certain non-depositing bondholders as representatives of all those who had not so deposited their bonds.

The Shapiro and committee's petitions and the master's report of sale were set for hearing on March 20, 1935. The master was directed to notify all depositing and non-depositing bondholders of the time and place of the hearing, and that any bondholder might present objections to the confirmation of the sale or plan of re-organization. This was done accordingly. Answers to the committee's petition were filed by various parties who are bondholders and have become appellants here. Certain bondholders filed their consent to the proceedings. At the time of the hearing eighty-six per cent of the bondholders had joined with the committee.

The hearing was had on March 20 and 21, 1935. Evidence was offered by the bondholders' committee and appellants. At the conclusion of the hearing the chancellor continued the matter until April 3 for study of the evidence and for further opportunity to objectors to make investigation. On that day Bernard D. Harris, also an appellant, filed a petition asking that the foreclosure proceedings be consolidated with a suit for the liquidation of the Bryn Mawr Corporation, mortgagor. The court permitted the filing of this petition but denied the prayer on the ground that the latter suit was not at issue. On that day Harris also filed a petition seeking to have the court adopt an alternative plan providing for the appointment of a receiver with power to dispose of the property and divide the proceeds. This plan was disapproved. On April 3 the

court approved the report of sale, and, with certain modifications, the plan of re-organization submitted by the bondholders' committee. The order of approval provided that all bondholders who had not theretofore deposited their bonds with the depositary of the committee might have ninety days from the entry of the order in which to do so. The trustee was directed to, within forty-five days, prepare and file a true and accurate account of its operation from December 13, 1931, to February 28, 1935, and that within thirty days thereafter any person in interest might file objections to such account. By this supplemental order the court also found that on February 28, 1935, the trustee, as shown by its tentative report, had in its possession the sum of $292,059.40 derived from the operation of the premises and on that date was indebted in the sum of $21,704 for costs and expenses incurred in such operation, and ordered that it forthwith distribute the sum of $250,000 *pro rata* among all bondholders. From the supplemental order and decree appellants appealed to the Appellate Court, where it was affirmed, as hereinbefore stated.

Appellants raise three primary propositions: (1) The superior court, as a court of equity, was without jurisdiction of the subject matter of the intervening petition; (2) the plan offered by the committee was unfair and inequitable; (3) that the property was sold for a grossly inadequate sum and as the result of a plan or fraudulent device which deprived the non-depositing bondholders of their property without due process of law. They also contend that the trustee was authorized to, and should have been directed by the court to, bid at the sale, and that the plan submitted by appellant Harris for the appointment of a receiver and disposition of the property of the mortgagor corporation was a fair and equitable plan.

The theory of appellees is that a court of equity has jurisdiction to consider a plan of re-organization in connection with a hearing on the approval of a foreclosure sale as

here presented; that the plan offered by the committee was fair and tended to bring the greatest amount obtainable for all bondholders who would participate, and that the price bid for the property by the representative of the depositing bondholders represents the fair value of the property. They also argue that the trust deed did not authorize a bid by the trustee on behalf of the bondholders, and that it was in nowise guilty of negligence or unfair conduct in failing to bid.

Did the superior court of Cook county, as a court of equity, have jurisdiction of the subject matter of the committee's petition for approval of its plan of re-organization on the application for approval of the foreclosure sale? This is a new question in this court. Appellants say that such jurisdiction is not inherent, and the foreclosure decree having been entered at a previous term of court, and so having become final, the court had no further jurisdiction in the matter other than to approve or disapprove the sale. Appellees, on the other hand, while admitting that the foreclosure decree was a final decree, say that not only does a court, as a court of equity, have inherent jurisdiction, but that it also specifically recited in the foreclosure decree that jurisdiction for the purpose of entering such other or further order or orders, not inconsistent with the decree, as to the court may seem necessary or proper, was retained.

The problem presented whenever default is made in the payment of a large debt of this character, divided, as it usually is, into units of small denomination and widely distributed, has long been a serious one. Default on the part of the mortgagor presents a situation in which the individual bondholder, because not in a financial position to purchase the property, faces a possible loss of his entire investment. It is a matter of which courts may take judicial notice that properties of the character here involved never sell at foreclosure sale at anything approaching their reproduction cost, and that, because of difficulty in securing

cohesive action on the part of the bondholders and the absence of an open market for such large properties, they seldom bring on such sale a price in any way commensurate with their value as going concerns. While courts will also take judicial notice that during the past few years economic conditions have greatly heightened the dangers of the situation, the problem is not one growing simply out of the depression but is inherent in the financing of large properties of the character here involved.

Until about twenty years ago the courts of this country were uniform in the view that they had no concern with the business of a re-organization of bond or debt encumbered properties of a corporation, but it was thought that the sole function of equity courts was, through receiverships and injunctions, to supervise the assets pending sale or liquidation, as the creditors might determine, and to sell the property at foreclosure sale for what it might bring. During the last twenty years, however, Federal courts have been of the view that equity jurisdiction does extend to the examination and approval or disapproval of proposed plans of re-organization. It is true that in most of the cases, such as *Kansas City Terminal Railroad Co.* v. *Central Union Trust Co.* 271 U. S. 445, 70 L. ed. 1028, *Louisville Trust Co.* v. *Louisville, N. & A. R. R. Co.* 174 U. S. 674, 43 L. ed. 1130, and *Guaranty Trust Co.* v. *Missouri Pacific Railway Co.* 238 Fed. 812, jurisdiction has been taken on the ground that the defaulting mortgagor was a railroad or other public utility, and that the public interest was sufficient to justify a court of equity in taking jurisdiction of a plan to keep such utility in operation. The equitable jurisdiction of Federal courts has not, however, been limited solely to cases where utilities were involved, as is shown by *Bethlehem Steel Co.* v. *International Combustion Engineering Corp.* 66 Fed. (2d) 409, *Graselli Chemical Co.* v. *Ætna Explosives Co.* 252 Fed. 456, and like cases, where a court of equity has taken jurisdiction to consider the

means by which re-organization of private corporations was sought to be effected and to approve or disapprove the same and the foreclosure sale had in connection therewith. In these cases it has been recognized that where large properties, as to which rights and relations are complicated, are sold at foreclosure sale, such sale, disconnected with a plan of re-organization, is likely to prove disastrous, as it rarely obtains for the property any approach to a fair price and often enables a financially strong group to gain by combined action an unfair advantage over those who do not have the means to protect the sale. And so these courts of equity have withheld the sale of the mortgaged property under the protection of possession by a trustee or receiver appointed by the court or acting under the terms of the trust deed, until such time as a sale might be had as a step in the re-organization of the concern. For this purpose the court takes jurisdiction to consider the fairness of the plan proposed. This, as we understand it, has been the underlying purpose of the exercise of equitable jurisdiction in cases of this character. *First Nat. Bank* v. *Flershem,* 290 U. S. 504, 78 L. ed. 465; *National Surety Co.* v. *Coriell,* 289 U. S. 426, 77 L. ed. 1300; *Habirshaw Electric Co.* v. *Habirshaw Electric Cable Co. Inc.* 296 Fed. 875.

It is not pointed out wherein equity jurisdiction and powers of State courts are to be considered more limited or restricted than those of the Federal courts. It has frequently been held, in the absence of an appropriate and controlling statute, that under foreclosure proceedings questions of adverse or paramount legal title to the real estate may not be tried, as such questions are legal and not equitable and are not germane. (*Jones* v. *Horrom,* 363 Ill. 193; *Whitaker* v. *Irons,* 300 id. 254; *Gage* v. *Perry,* 93 id. 176; *Eagle Fire Co.* v. *Lent,* 6 Paige, 637.) Equity jurisdiction of foreclosure proceedings is, however, general and not statutory or special. Until recent years foreclosures of trust mortgages were brought almost exclusively in the

Federal courts. At the present time, however, there are a large number of such proceedings in the State courts involving very large properties, with a great number of interested bondholders. It would seem that since equity courts have always exercised jurisdiction to decree the enforcement of mortgage liens and to supervise foreclosure sales, such jurisdiction need not expire merely because the questions or conditions surrounding the exercise of such time-honored functions are new or complicated. If it may reasonably be seen that the exercise of the jurisdiction of a court of equity beyond the sale of the property will result in better protection to parties before it, it would seem not only to be germane to matters of undisputed jurisdiction, but to make for the highest exercise of the court's admitted functions.

Counsel for appellants say, however, that a foreclosure proceeding is a matter of special rather than general equity jurisdiction, limited to the purpose of foreclosure and sale. They cite recent cases of the Supreme Court of the United States (*Duparquet, Huot & Moneuse Co.* v. *Evans,* 297 U. S. 216, 80 L. ed. 591, and *Tuttle* v. *Harris,* 297 id. 225, 80 L. ed. 654,) as supporting that view. Those cases involve the question whether, under section 77*b* of the Bankruptcy act, a trustee in bankruptcy appointed under that act is entitled to take possession of property held by a trustee or receiver under foreclosure proceedings. It was held that receivers or trustees under foreclosure proceedings were not within the contemplation of Congress in the passage of section 77*b;* that such receiverships are not for the purpose of protecting general creditors but mortgagees only, and are therefore limited and special rather than general equity receiverships. The fact that a foreclosure receivership or trusteeship is not a general equity receivership, and so does not come under section 77*b* of the Bankruptcy act, is in nowise an indication that it is not, nevertheless, within the general equity jurisdiction of the court.

Where, as here, the sale of the property on foreclosure is a step in a re-organization project, which project the bondholders have an absolute right to engage in if it be a fair plan, it is difficult to see how a court of equity could fairly and adequately consider the approval of the fore-closure sale without also considering the re-organization plan. Certainly, if such a plan is proposed, it would appear that in a court of equity only may the greatest protection to all concerned be assured. Whether the sale price is adequate or inadequate may depend upon the plan of re-organization open to all bondholders. It is not doubted that the committee could file a separate bill to approve this plan, but a determination of questions involved in such plan may well depend upon the approval of the sale. If the plan be approved and the foreclosure sale not, then all have been engaged in a useless effort and expense. If, on the other hand, the sale be approved and the plan not, the purchasers at the sale will be confronted with an inability to comply with their bid, and this although the trust deed gives them a right to use any bonds they may have in payment of their bid, and here the holders of more than eighty-five percent of the bonds are seeking to buy the property under the plan. It may be further observed that an attempt to carry out a bondholders' plan of re-organization without the approval and supervision of a court of equity would be attended with so many dangers and uncertainties that few bondholders would be willing to enter the arrangement, though convinced that, properly supervised, the plan would retrieve for them the greatest possible percentage of their investment. Certainly, to secure such percentage to the mortgagee bondholders cannot be said to be outside the scope of equity jurisdiction.

Appellants say the trust deed does not provide for a re-organization plan; that their rights are contract rights, and they are entitled to have the property sold at the high-

est bid and the proceeds distributed, and that under the plan proposed their contract rights are violated, for they are to be either forced into an unconscionable plan or "frozen out." Certainly, there can be no violation of contract rights arising out of an assumption of jurisdiction of the re-organization plan by a court of equity. No one is required to join the depositing committee. The sale has been decreed, and all who do not desire to join the plan may take their share of the proceeds in cash. If the plan is unfair or appellants are in danger of being "frozen out," a court of equity should extend its aid to those who, by reason of their numbers and widely scattered abodes, are unable to protect themselves against an unconscionable plan or a scheme to prevent the sale of the property at a fair price.

This court has laid down no rules of equity preventing the exercise of jurisdiction in a case of this character. In *Anderson* v. *Anderson,* 293 Ill. 565, where a bill to set aside a will and also to enforce a trust agreement was thought by the chancellor to be demurrable as multifarious, this court, in reversing the decree, observed: "The modern tendency of the courts is to relax the rigid rules of pleading and to hold that a bill is not multifarious where the various causes set forth in the bill may more conveniently be tried in a single suit, where it will avoid a multiplicity of suits. * * * The rule has been long established that in equity proceedings the bill should be so planned as to afford ground for a decision on the whole matter at one and the same time and so far as possible prevent further litigation concerning it. One of the favorite objects of a court of equity is to do full and complete justice by avoiding a multiplicity of suits."

In the early case of *Hurd* v. *Case,* 32 Ill. 45, it was held that a cross-bill, filed after a mortgage sale, was germane to the original bill as directly connected with it and so properly received by a court of equity. In *Ruprecht* v. *Muhlke,* 225 Ill. 188, a foreclosure of a first mortgage, and

a sale thereunder, were had and confirmed. The holder of the third mortgage took possession of the property. The second mortgagee filed in the original proceedings a cross-bill for the appointment of a receiver to conserve and apply the rents, and it was contended here, on review, that the cross-bill was not filed in apt time, but it was said that if there was no attempt on the part of the cross-complainant to interfere with the final decree, which had been entered and executed by sale of the premises, the cross-bill was proper. So in *Totten* v. *Totten,* 299 Ill. 43, an application was made for an extension of time for payment of the sum to redeem from a mortgage which had been foreclosed and on which sale had been had. The extension was granted and the power of the court to do so was questioned in this court on review. The rule that a court does not have power, after the expiration of the term, to 'amend the principles of its final decree was there recognized, but it was held that a court of equity does retain and possess the power to control the time and manner of the execution of its judgments and decrees.

The above and similar cases, though not deciding the question here, evidence a recognition by this court that rules of equity jurisdiction have developed and are developing, and that judicial proceedings must be adjusted to facts as they are. All who are conversant with the history of equity jurisprudence know that as a distinct system it has been of constant growth and development from its inception, covering a period of hundreds of years. "The jurisdiction of a court of equity does not depend upon the mere accident whether the court has, in some previous case or at some distant period of time, granted relief under similar circumstances, but rather upon the necessities of mankind, and the great principles of natural justice, which are recognized by the courts as a part of the law of the land, and which are applicable alike to all conditions of society, all ages, and all people." (*Dodge* v. *Cole,* 97 Ill. 338.) This

view of the equity power of the courts of the States is to be found in principle, though on differing facts, in *Johns v. Montgomery*, 265 Ill. 21; *Packard v. Illinois Trust and Savings Bank*, 261 id. 450; *City of Detroit v. Detroit United Railway Co.* 197 N. W. (Mich.) 697; *Colorado and Southern Railway Co. v. Blair*, 214 N. Y. 497, 108 N. E. 840; *Mann v. Mann*, 122 Me. 468, 120 Atl. 541; *Bennett v. Nashville Trust Co.* 127 Tenn. 126, 153 S. W. 840, 46 L. R. A. (n.s.) 43. The same reason lies behind the call upon equity courts of the States to take cognizance of re-organization agreements of corporations of the character here as has moved the Federal courts to do likewise in cases of corporations other than public utilities. If equity may not take jurisdiction of a proceeding of this character, it may well be asked what protection an unorganized minority of bondholders has against an organized majority who are able to procure the equities of redemption and bid a grossly inadequate price without inquiry of the court as to the fairness of such bid or the plan under which it was made. We are of the opinion that proceedings under the intervening petition are germane to the foreclosure suit, and that equity courts of this State should, and do, have jurisdiction to hear and decide such a petition.

To the argument of appellants that the term at which the foreclosure decree was rendered had passed, appellees say that the chancellor reserved jurisdiction for the purpose of entering such other or further orders, not inconsistent with the decree, as to the court may seem necessary or proper. We are of the opinion that, if needed to retain jurisdiction in this case, such reservation was sufficient to so do. No one will contend that a decree for foreclosure is the last and only order or decree that can be made in such a proceeding.

We come next to a consideration of the fairness of the proposed plan, of which, as the committee's petition discloses, its bid at the sale was a part. The plan and the

bid are therefore to be considered together. Being thus related, equity will look to the fairness of both. The plan, to be fair, must carry with it a bid for the property which is fair to the bondholders not desiring to enter into the plan. This re-organization plan was devised by a bondholders' committee, only one of whose members is a bondholder.

The use of bondholders' committees in matters of re-organization has been long recognized by courts and by students of finance. It was sanctioned by the Supreme Court of the United States as early as *Shaw* v. *Little Rock and Fort Smith Railroad Co.* 100 U. S. 605, 25 L. ed. 757, and as late as the recent case of *Bullard* v. *Cisco,* 290 id. 179, 78 L. ed. 254. While such committees have not infrequently been severely criticised because of unconscionable advantage taken of their fiduciary position, yet the unorganized condition of bondholders renders it necessary that someone take the initiative in organizing them. The fact that the committee was not appointed by a majority of the bondholders is not, of itself, of importance, since the plan is open to all and the acts of the committee are subject to review by the court. The practice of securing the assistance of highly-responsible men to serve in such capacity is to be approved rather than condemned. The possibility that such a committee may overstep its authority or go beyond the bounds of fairness argues most strongly for the supervision of a court of equity for the protection of all bondholders.

The plan here presented provides for the prompt acquisition of a merchantable title to the real estate, to be placed in a liquidating trustee under a liquidation trust agreement. Under the terms of this trust the entire net income and the proceeds from the sale of the property are payable to the participating bondholders until they receive the full amount of the bonds originally held by them, plus interest at five per cent from October 1, 1931. Each participating bondholder is to receive, for each $100 face value

of bonds held by him, an income note for $50 due in fifteen years and a debenture known as a "preferred unit" of beneficial interest, of the face value of $50. The income notes are the obligations of the liquidation trust and a charge upon the property involved. In case of a sale the income notes are matured. The preferred units represent an interest in the income of the property to the extent of their face value. They are subject only to the income notes. Under the re-organization plan one-half the income from the property, after payment of certain portions thereof upon the securities to be issued to participating bondholders, is to be placed in a sinking fund for the benefit of such holders. Upon retiring these notes, which the trustee is empowered to do at any time, the sinking fund is to be used to purchase the preferred units. Such units, however, are not otherwise redeemable through the sinking fund. This provision, it is pointed out, is to prevent the income from the property being used to compel the holders to part with the preferred units if they desire to continue in possession of them. The plan provides for a trustee, for trust managers, and the active management of the property by the manager of the Edgewater Beach Hotel, which adjoins the property involved in this proceeding. It is required that the trustee shall be some banking institution having a capital and surplus of at least $1,000,000. The fees for the management are fixed by the plan for one year, and thereafter to be fixed by the trust managers within the limits specified by the decree approving the plan. Non-participating bondholders are to be paid their share of the purchase price in cash.

The bondholders' committee purchased the equity of redemption from the mortgagor for the sum of $10,000. Appellants object that this was an unfair way to use the money of the bondholders. It will be remembered, however, that a deficiency decree has been entered against the mortgagor, and on execution under that decree this sum

will doubtless be returned to the committee. The purpose of this purchase, as stated in the plan, is to place a merchantable title into the liquidating trust, so as to render possible the execution of the plan of liquidation. The chancellor personally investigated and heard evidence as to the qualifications of the trust managers and pronounced them qualified. No evidence appeared to the contrary. We are of the opinion that the finding of the chancellor that the plan of re-organization is fair and tends to secure the best return for the bondholders is justified.

We come, then, to a consideration of the fairness of the bid by which the property was purchased at the foreclosure sale. Counsel for appellees say that inadequacy of the purchase price at a foreclosure sale is not a sufficient ground for setting aside the sale, and they cite *Chicago Title and Trust Co.* v. *Robin,* 361 Ill. 261, and numerous other decisions of this court. Here the bid was but a step in the reorganization. It must be admitted that it was in the interest of all depositing bondholders that the property be purchased at the lowest possible bid, and it was likewise to the interest of the non-depositing bondholders that the property be sold at the highest possible bid. It was stated by Gilbert A. Scribner, testifying for the committee, that the committee arrived at the purchase price by "figuring how much money we had on hand, how much bonds we would have to pay and tried to gauge the purchase price on that basis. This is the only basis on which we could arrive at the sale price. Nobody had any money to put up to pay it. We were representing the depositing bondholders. We did not pay attention to the value of the land or the building." It is evident that while the opportunity was open to all to come into the depositors' agreement, and if all had entered into it the sale price would be of no concern to anyone other than the mortgagor, yet, so long as there were non-depositing bondholders who were not agreeing to deposit their bonds, it is the duty of the court to see that the sale price

was not unfair. This case, therefore, differs from those cases wherein it has been said that inadequacy of price alone is not sufficient to justify the chancellor in setting aside a foreclosure sale. Without reviewing the cases relating to the power of the court to set aside an ordinary foreclosure sale, it is sufficient to say that the circumstances surrounding the making of this bid and the formation of this bondholders' agreement, together with the duties resting upon the trustee, who, the record shows, was a party to the committee's plan, to protect the interest of all bondholders, (*White* v. *Macqueen,* 360 Ill. 236,) are all so bound together as to authorize the court to consider and determine whether the bid was fairly made, and if not, to disapprove it and order a re-sale. In so doing the bid is to be considered from the standpoint of bondholders who have not entered into the re-organization plan as well as those who have. Equity will not concern itself, however, with the relationship of the depositing bondholders to the plan. Presumably they are all capable of contracting, and they have done so. Their agreement as to the price to be paid at the foreclosure sale, if there was such an agreement, was clearly within their contractual rights. The court is concerned with the fairness of the bid as to those bondholders who have not adopted the plan. In this it must be borne in mind, however, that non-depositing bondholders are not to be aided in an effort to create a maneuvering value for their bonds or give them a nuisance value by attempting to obstruct re-organization.

While ample notice of the sale was given, yet it is but trite to say that anyone could bid who wished, for, as a court of equity cannot fail to recognize, the advantageous position of the majority of the bondholders united, over the ununited minority who have not agreed to the re-organization plan, is such that, in the case of a very large property, unconscionable advantage may be taken of the latter. Furthermore, the committee is seeking the aid of equity, and

it is a familiar maxim of equity that he who would invoke its aid must himself do equity, and the committee, in seeking the aid of the chancellor in the approval of its plan, must show that it, too, has been doing equity. The price bid was $1,040,225. In addition to that there was an accumulation of taxes, which brings the price to the participating bondholders up to $1,153,408.75. In considering this bid the court cannot overlook the testimony as to the economic conditions affecting the disposition of large properties of this character. It appears that in the last twenty years no apartment hotel has been sold in the city of Chicago for as much as one and one-half million dollars in cash. The report of the trustee covering the period from December 13, 1931, to December 31, 1934, shows a net income over operating expenses, not allowing for depreciation, of $437,933.80. During the year 1932 the income was $231,786. In 1933 it was $95,296, and in 1934 it was $101,158. The average was $145,977.94. The evidence also is that in forming a basis for estimating the value of property of this character its net earnings are the main consideration. This is the view of most economists and real estate experts. It is in evidence that a safe and conservative method of reaching sale value is to capitalize the net earnings on the basis of eight or ten per cent—that is, as twelve and one-half times or ten times net earnings. The average net earnings for the three years being $145,975, they would, under this system of valuation, bring the sale value of the property, capitalized at eight per cent, to something over $1,750,000, and at ten per cent to something over $1,450,000. Appellants offered in evidence the appraisal made in 1932 for the committee by C. J. Pose, in which he computed the annual net income expectancy at $317,598 and the value of the whole property at $3,638,000, considering also reproduction costs. Comparing Pose's estimated annual income expectancy with the actual net income for the period shown in the trustee's report, it is seen that the latter is less than one-half the

former. It is commonly known and accepted among realtors, that in appraising the value of apartment buildings the elements of obsolescence and income play a most important part. Recognized authorities on the appraisal of real estate are in accord in the view that future income, by reason of its uncertainty, cannot be taken as a safe guide in fixing values; that the value of apartment buildings should be based largely on a capitalization of the actual net income before allowance for depreciation. (The Appraisal of Real Estate, by Frederick M. Babcock; 1 Journal of American Institute of Real Estate Appraisals, No. 4, by Ivan A. Thorson.) The only evidence of value offered by appellants is the Pose appraisal referred to and the assessor's valuation of 1931 for taxation purposes at $3,825,948. Based upon the evidence in this record of income and expenses from December 13, 1931, to December 31, 1934, and recognized methods of estimating value, there is in the value of the property here a substantial margin over the bid. The chancellor had, however, wide discretion in the matter of approval or disapproval of this sale, and we are unable to say, on a consideration of the whole record, that he erred in refusing to hold that the sale of the property in this case, as a part of the re-organization plan, was unfair and inequitable. The record contains no evidence that a re-sale would bring a sufficiently larger amount to net a substantially larger sum to the non-depositing bondholders, after paying the expenses of both sales.

Counsel for appellants argue, however, that the trustee owed a duty to bid in the premises for the bondholders at a fair price and that the court should have required him so to do. By section 5 of article 6 of the trust deed it is provided: "The trustee or holders of any bonds may on its or their own behalf bid for and purchase any of the mortgaged property sold pursuant to judicial proceedings, and any purchaser at such sale may use and apply any of said bonds and any matured and unpaid coupons attached

thereto toward the payment of the purchase price," etc. By section 1 of article 9 of the trust deed the trustee is authorized to buy, sell or deal in any of the bonds or coupons, and, as the holder thereof, may join or initiate any action which any bondholder might be entitled to take, with like effect as if he were not a trustee. That section also provides that in all actions, suits or proceedings dealing with or relating to the mortgage or the mortgaged property the trustee shall be deemed to be the representative of the bondholders, and that it is unnecessary to notify any bondholder of, or make him party to, any action or proceeding. This section also provides that the trustee may enforce any rights of action under the mortgage without the possession of the bonds or coupons and shall have the right to bring any action in his name as trustee.

Counsel for appellants argue that the language of section 5 of article 6 of the trust deed, "the trustee or holders of any bonds may on its or their own behalf bid and purchase" the mortgaged property, is full authority to the trustee to bid in the property for all the bondholders. Appellees, on the other hand, say that it authorizes him to bid in his own behalf, but that there is no provision in the trust deed imposing on the trustee authority or duty to bid at the sale on behalf of all the bondholders. This court held in *Chicago Title and Trust Co.* v. *Robin, supra,* that in the absence of express authority in the trustee to bid in the property in behalf of all the bondholders he cannot be required so to do. Though the language of this trust deed be construed to authorize the trustee to bid at the sale for all of the bondholders, which is open to doubt, there is a more serious doubt whether the chancellor would have been justified in requiring the trustee to bid in this case even under clear authority in the trust deed. On this record it may well be doubted whether it would have been wise for a trustee to bid in the property. There being no open market for large structures of this character, the probability of the bond-

holders eventually securing more than can be secured under the plan of the bondholders' committee is but faint. There is neither showing in this record nor reason to believe from the record that such a plan would work out better than the plan of re-organization presented by the depositing bondholders. A trustee is vested with discretion, subject to the control of a court of chancery. (*Maguire* v. *City of Macomb,* 293 Ill. 441; *Jones* v. *Jones,* 124 id. 254.) We are of the opinion that under the provisions of the trust deed and the circumstances of this case the chancellor did not err in refusing to require the trustee to bid, and that there was no negligence or failure of duty on the trustee's part in failing to bid.

Counsel for appellants throughout their brief use strong language in charging fraud. Fraud is a charge easy to make, particularly under the protection of court proceedings. There is not, however, in this record, evidence justifying a conclusion that there has been irregularity or fraud in connection with this foreclosure sale. If the sale was fair then it is of no concern to the non-depositing bondholders what the agreement was, as they cannot be required to be a party to it. Careful examination of this record fails to disclose any evidence of fraud or oppression. Every opportunity has been given to non-depositing bondholders to join in the plan. The matters alleged to be fraudulent are the steps taken to have the mortgage foreclosed and the property sold. The charge of counsel for appellants that large amounts of the bonds were combined to bring about a foreclosure and to make up the purchase, though true, is not sufficient to constitute fraud, for the bondholders had a right so to do. Nor is there any evidence that the depositing bondholders are trying to "freeze out" the non-depositing bondholders. Whether on re-sale the property would bring a higher sale price is pure speculation. No one has come forward with a showing that the property would bring more, and, after all, the only value in which the bond-

holders are interested is that which will contribute toward the payment of their bonds. If the plan succeeds, all participating bondholders will be paid the face of their bonds.

It is said that the court did not have jurisdiction of all bondholders. All were by the terms of the trust deed represented by the trustee and were in court through it, and whatever bound it, if it acted in good faith, bound them. (*Shaw* v. *Little Rock and Fort Smith Railroad Co. supra.*) Moreover, out of an abundance of caution certain persons were made parties as representatives of a class. All bondholders received notice. This was due process. *Supreme Tribe of Ben-Hur* v. *Cauble*, 255 U. S. 356, 65 L. ed. 673.

Appellants argue that Shapiro's plan of re-organization should have been adopted by the chancellor. The chancellor considered that plan and rejected it and we cannot say that he abused the discretion vested in him in that behalf.

Numerous other objections to the plan are argued in the briefs. To present them all in detail here would extend this already lengthy discussion beyond justifiable bounds. We have considered them all. They were all likewise considered by the chancellor and the Appellate Court. We are of the opinion that they do not require nor justify a reversal of this decree. It is unfortunate that in the enthusiasm of inflated economic conditions so many have been induced to invest their funds in what later proved to be a badly over-bonded property. The chancellor, however, had jurisdiction to consider, and the power to approve, the plan submitted, and we are of the opinion that he did not err in so doing.

The supplemental decree was right and the judgment of the Appellate Court is affirmed. *Judgment affirmed.*