Herman S. Strauss, Trustee, Appellant, v. Philip A. Danielson, Appellee.

Gen. No. 42,661.

Opinion filed May 29, 1944. Rehearing denied June 12, 1944.

RICHARD WEINBERGER, of Chicago, for appellant.

WILHARTZ & HIRSCH, of Chicago, for appellee; SAMUEL E. HIRSCH, JULIAN H. LEVI and WILLIAM RUGER, all of Chicago, of counsel.

MR. PRESIDING JUSTICE O'CONNOR delivered the opinion of the court.

By this appeal plaintiff seeks to reverse a decree entered by the Superior court of Cook county dismissing his complaint for want of equity.

Plaintiff brought suit against defendant to recover on a written guaranty dated March 15, 1927, whereby defendant guaranteed the payment of a bond issue of $430,000, the payment of which was secured by a trust deed on the Homestead Hotel, located in Evanston, and by a chattel mortgage on the furnishings of the hotel. In a foreclosure proceeding a decree was entered January 26, 1932, in which it was found there was due and unpaid to the bondholders $397,500, and in addition, the foreclosure fees and expenses, making a total of $414,631.52. The property was sold under the decree on January 30, 1934 to the nominee of the bondholders' protective committee for $50,000. The master in his report of sale found there was available for distribution, $47,129.35, leaving a deficiency of $393,299.12. Objections filed to the master's report of sale were overruled and April 27, 1934, a deficiency decree was entered for the amount of the deficiency.

The record discloses that in 1927 defendant, Philip A. Danielson, an architect, designed a building project known as the Homestead, to be constructed in Evanston and then negotiated with Strauss Brothers Company, mortgage Underwriters, for the making of a $430,000 loan for the construction of the Homestead. The Homestead Building Corporation was formed in which defendant owned a substantial amount of the stock. The building corporation executed a temporary bond to the Strauss Brothers Company for the $430,-000 and March 15, 1927, the corporation executed its trust deed to secure the payment of the temporary bond and the permanent bonds when issued. Contemporaneously with the making of the trust deed, defendant executed the guaranty which is the basis of the suit at bar, by the terms of which he unconditionally guaranteed to pay to Herman S. Strauss, Trustee,

and to the "holder or holders from time to time of those certain permanent definitive coupon bonds" aggregating $430,000 executed by the Homestead Building Corporation and secured by trust deed of the same date to Herman S. Strauss, Trustee, and to his successors in trust "for the benefit of the holder or holders from time to time of said certain coupon bonds and of the coupons thereto attached, and of the holder or holders from time to time of the temporary bond hereinafter described." The guaranty further provided "that this Guaranty shall be independent of and in addition to the rights and remedies of the said Trustee and of the respective holders of said bonds . . . and all remedies against the undersigned shall be concurrent with and not exclusive of any proceeding or remedies instituted or availed of by the bondholders or the Trustee." The undertaking was an original undertaking and not conditioned on the failure of the mortgagor to pay.

After the guaranty was executed it was suggested that the guaranty be endorsed on the face of the permanent bonds so as to make them salable to the public, which was accordingly done. Some payments were made on the bonds as they fell due but prior to 1932 default was made and a bondholders' committee was formed by a substantial majority of the outstanding bondholders and in March, 1933, defendant submitted to the committee a proposed plan for reorganization of the Homestead Corporation, and a liquidating trust to operate and liquidate the property was formed. About 90 per cent of the bondholders agreed to the plan and it was approved by a decree entered in the foreclosure proceedings and the non-depositing bondholders were given a year within which they might deposit their bonds and accept the plan. The property was operated and the matters necessary to carry out the plan were followed and a number of the non-

depositing bondholders accepted the provisions of the decree until all but about 5 per cent of the bondholders had deposited their bonds.

We think it unnecessary to detail here all that was done after the deficiency decree was entered. The chancellor in deciding the case said: "In 1933 and 1934 we know that there was a great depression. It was utterly impossible to procure a bona fide purchaser, or rather a purchaser who really intended to acquire title at a foreclosure sale of property of this character. Hence there was only one thing for the bondholders' committees to do, . . . and that was to endeavor to consummate a plan of reorganization which would contemplate acquisition of the interest of all of the subordinate interests and then proceed to a sale of the property at which the nominee of the committee would acquire the title at a price which would make it advantageous to any non-depositing bondholder to come into the plan of reorganization. It was not intended that it should be a fair price. It would have been unfair to the depositing bondholders who made possible by their cooperation the consummation of a plan of reorganization that any attempt should have been made by the bondholders' committee to actually fix a price that would represent the fair value of the property. If they did that the non-depositing bondholders who did not cooperate and who did not work with the committee, who did not engage lawyers, who did not pay for the lawyers,—those non-depositing bondholders would walk off with the cash while the depositing bondholders would have to get what they could through participation in the plan of reorganization.

"Now, while in a sense that would have resulted in those non-depositing bondholders who remained obdurate and refused to go along with the depositing bondholders, while it would have been unfair to them

in one sense, that unfairness was completely obviated by the bondholders' committee submitting themselves to the jurisdiction of the court and saying to the court, 'If there is anything not fair about the way we are treating the non-depositing bondholders, let them come into this plan of reorganization even at this belated date, and let them have one year in which to do it.'

"Now, that was the plan which was finally worked out in our state courts, as I know because I practiced in chancery in these courts and as every chancellor who went through that period of depression well knows. To hold that the sale price at such a foreclosure sale, procured by cooperation of the bondholders with the committee, would equitably represent a basis on which the owner of the equity could be held liable on a guaranty, shocks one's sense of equity. The result would be that these bondholders who had waited, who had participated in what was obviously a very good plan of reorganization for them, who got $115 for every $100 bond, could now, if we allow that theory to stand, claim from the equity owner the difference between the nominal amount distributable from the proceeds of the foreclosure sale and the full amount of the guaranty. No court of equity could follow that kind of a principle, and none of the cases require me to do it. . . .

"Mr. Weinberger [counsel for plaintiff]: Does that order also apply to any non-depositing bondholders who received substantially ten cents on their bonds?

"The Court: The order applies to all. The case was tried before me on one theory, and that was that the sale price at the foreclosure sale represented the basis on which the liability under the guaranty could be determined. . . . — the case both on the pleadings filed by the trustee complainant and on the trial is based entirely on the one theory, and that is that the deficiency decree determined the amount of damages.

Now, let there be a general order of dismissal for want of equity.''

In a foreclosure suit coupled with a reorganization plan which was approved by our Supreme court in *First National Bank v. Bryn Mawr Building Corp.*, 365 Ill. 409, objection was made by non-depositing bondholders to the confirmation of the master's report of sale. One of the objections urged was ''that the property was sold for a grossly inadequate sum and as the result of a plan or fraudulent device which deprived the non-depositing bondholders of their property without due process of law. . . .

''Where, as here, the sale of the property on foreclosure is a step in a re-organization project, which project the bondholders have an absolute right to engage in if it be a fair plan, it is difficult to see how a court of equity could fairly and adequately consider the approval of the foreclosure sale without also considering the re-organization plan. . . . Whether the sale price is adequate or inadequate may depend upon the plan of re-organization open to all bondholders.'' The court then discussed the plan and continuing said: ''No one is required to join the depositing committee. The sale has been decreed, and all who do not desire to join the plan may take their share of the proceeds in cash.'' The court then considered the fairness of the proposed plan and that the bid, as a part of it, must be considered. The court held both were fair and were approved, and continuing said: ''Equity will not concern itself, however, with the relationship of the depositing bondholders to the plan. Presumably they are all capable of contracting, and they have done so. . . . The court is concerned with the fairness of the bid as to those bondholders who have not adopted the plan. In this it must be borne in mind, however, that non-depositing bondholders are not to be aided in an effort to create a

maneuvering value for their bonds or give them a nuisance value by attempting to obstruct re-organization.''

In the instant case, following the reasoning of the court, we think the depositing bondholders are not entitled to any relief. ''Presumably they are all capable of contracting, and they have done so.'' They deposited their bonds, received certificates of interest and for a number of years have been paid the proceeds derived from the operation of the property, and in addition, the property was afterward sold for $292,500 which was distributed to the owners of the preferred certificates of interest, which they would not have received but for the adoption and approval of the plan. The total distribution to certificate holders per unit was $114.26. This was not the full amount that would be due on the bonds with interest. In these circumstances they ought not now be permitted to say that they still have a right to recover on the guaranty. But we are of opinion that this cannot be said as to the non-depositing bondholders. They refused to take part in the plan. So far as we are advised, not a word was said in the foreclosure proceeding or in the plan approved, about the guaranty which is the basis of the suit before us. Objections to the approval of the sale of the premises for $50,000 were overruled and the deficiency decree entered. In these circumstances we think the non-depositing bondholders are entitled to be paid the amounts which are due and unpaid on the bonds held by them respectively, which counsel for plaintiff says are of the face value of $12,800.

Counsel for defendant further say that ''Upon the execution by defendant of his guaranty on the bonds in substitution for the guaranty sued on herein, plaintiff lost all right to enforce the guaranty in suit.'' We think this contention cannot be sustained. We have above quoted from the provisions of the guaranty in suit from which it clearly appears that there was no

substitution of this guaranty for the one that was on the face of each bond.

The decree of the Superior court of Cook county is affirmed except as to the non-depositing bondholders and as to them it is reversed and the cause remanded for further proceedings in accordance with the views herein expressed.

*Affirmed in part, reversed in part and remanded with directions.*

NIEMEYER and MATCHETT, JJ., concur.