LEONARD and others vs. BARNUM and others.

PATENTS. (1) *Jurisdiction of state courts over contracts relating to patents.*
EQUITY. *Sale injurious to infants, made by administrator and guardian, set aside.*

1. A circuit court of this state has *jurisdiction* of an action to set aside *a sale of title and interest in a patent,* and the right of extension thereof, on the ground that such sale was procured by fraud.
2. Where the parties occupy in respect to each other peculiar relations, in which confidence is necessarily reposed by one and influence acquired by the other, all dealings between them are jealously watched by courts of equity, to see that such confidence is not betrayed. And this is especially true where one of the parties is an infant, or *inops consilii.*
3. An administrator in behalf of the estate, and an uncle of the heirs as guardian to such of them as were infants, and under a power of attorney given him for the purpose, upon his representations and advice, by two of his neices who were adults, sold to a patent-right agent, who was the brother-in-law of said administrator, the interest of the estate in a patent and in the right to an extension thereof. Such interest was worth several thousand dollars, and its value was fully known to the vendee, who was also well acquainted with the ignorance and necessities of the heirs; the sale was private, and the price paid was only $100, the vendee also agreeing to pay the guardian, "his heirs or assigns," $400 out of one-fourth of the profits from sales of rights. *Held,* that the heirs were entitled to a judgment setting aside the sale, upon payment by them to the vendee of moneys expended by him in procuring an extension of the patent and a reasonable compensation for his services.

APPEAL from the Circuit Court for *Kenosha* County.

Action to set aside a sale of plaintiffs' interest in a patent right. The case is stated in the opinion.

*Carys & Cottrill,* for plaintiffs, argued that the circuit court had jurisdiction of the action, which relates only to the title of the patent as an article of property, and involves no question as to the validity, construction or infringement of the patent in question. Patent Act of July 9, 1870, secs. 58, 59, 22, 36, 38,

39, 61 and 62; Const, of U. S., art. I, sec. 8; *Gibson v. Wood-worth*, 8 Paige, 134; *Burrall v. Jewett*, 2 id., 144; *Rich v. Hotch-kiss*, 16 Conn., 414; *Bloomer v. McQuewan*, 14 How. (U. S.), 550; *Wilson v. Sandford*, 10 id., 99; *Nesmith v. Calvert*, 1 Woodb. & M., 37; *Wright v. Wilson*, 11 Rich. Law, 152; *Tomlinson v. Battel*, 4 Abb. Pr., 266; *Goodyear v. Day*, 1 Blatchf., 565; *Goodyear v. Union Rubber .Co.*, 4 id., 63; *Sher-man v. Champlain Transp. Co.*, 31 Vt., 174; *Rowe v. Blanchard*, 18 Wis., 441. To the point that the action was maintainable if the alleged fraud and breach of trust were shown, they cited *McLachlan v. Staples*, 13 Wis., 448; *Weir v. Mosher*, 19 id., 311; *Stronach v. Stronach*, 20 id., 129; Story's Eq. Jur., §§ 186, 188, 193, 197–8, 204, 206, 207, 210, 212a, 218, 221, 222, 240, 242, 246; *Calkins v. The State*, 13 Wis., 392; *Smith v. Mariner*, 5 id., 551; *Miner v. Medbury*, 6 id., 309; *Barber v. Kilbourn*, 16 id., 488–91; Newland on Contracts, 358; *Howard v. Edgell*, 17 Vt., 9. They also discussed the evidence at length.

*F. S. Lovell*, with *Chas. E. Dyer*, of counsel, for defendants, contended that a state court has no jurisdiction of an action to set aside an assignment of a patent right, citing Acts of Congress of 1870, ch. 230, sec. 55; *Gayler v. Wilder*, 10 How. (U. S.), 477; 4 Abb. Pr., 266; 2 Paine C. C., 426; 4 Me., 434; 1 Woodb. & M., 34. They also argued at length upon the evidence, that no sufficient ground was shown for the relief demanded.

COLE, J. These are cross appeals from portions of the same judgment. The action is brought on behalf of the children and heirs of one Andrew Leonard, deceased, to set aside a sale and transfer of their title and interest in a patent right, issued by the government in 1857 to their father, for an improved method of casting thimble skeins for wagons, and for producing seamless thimble skeins. This interest, and all the right of the children in the extension of the patent, were sold in January, 1871, by *John Benedict*, acting as the administrator of the es

tate of Andrew Leonard, deceased, and by *Thomas English*, the uncle of the children, who acted under a power of attorney given by the two adult children, and as guardian of the four minor children. The sale was made to the defendant *Daniel Barnum*, who agreed to pay and did pay to the administrator, for the benefit of the heirs, the sum of $100. There was a further agreement by which *Barnum* undertook to pay *English* the sum of $400, out of one-fourth of the profits from sales of rights and royalties, but whether this was intended for the benefit of the heirs, or was to belong to *English*, is a controverted question in the case. There are seven children interested in the patent, and whose title and interest were sold. The court below, however, set aside the sale so far as the plaintiff *Andrew Leonard* was concerned, and adjudged him to be still the owner of an undivided one-seventh of the patent, but dismissed the complaint in respect to the other plaintiffs. Of the four infant children, *John*, *Bridget* and *Thomas* are joined as plaintiffs by their guardian *ad litem;* and *Joseph* is made defendant, and answers by his guardian *ad litem*, submitting his rights in the subject matter of the controversy to the care and protection of the court.

An objection arises *in limine*, which must be first considered. It is claimed on the part of the defendant, that the state court has no jurisdiction of the subject matter of the action. The object and purpose of the action are to set aside a sale of a title and interest in a patent and in the right of extension, on the ground that such sale was procured by fraud and imposition. The case presents substantially the same question as that involved in *Page v. Dickerson*, 28 Wis., 694, where the jurisdiction of the state court was maintained. The cause really involves no question, as we understand it, calling for any decision upon the construction of the patent laws, or in respect to the validity or infringement of a patent, but presents the simple point whether the title and interest of the heirs in the patent issued to their father, and in the extension thereof, have

been transferred and sold under such circumstances as warrant a court of equity in interfering and setting the sale aside. The matter in controversy is the validity of a contract relating to an assignment of the patent, and involves a question of title to property. We do not see any more reason, upon the facts, for denying jurisdiction to the state courts for determining whether this contract is legal and valid, than there would be in denying their jurisdiction in respect to other contracts relating to other species of property. For whether a sale of an interest in a patent has been procured through fraud, duress, or by any improper means, must be determined by the same rules and principles of law applicable to other contracts. The objection, therefore, that the state court had no jurisdiction of the subject matter of this action seems to us clearly untenable.

But before proceeding to a further consideration of the case, we feel called upon to express our great dissatisfaction and decided protest at the way this case is prepared for our examination. The printed case, containing the pleadings, testimony, exhibits, etc., makes a book of about five hundred and fifty pages, and all that was material to be included in the case, we are confident, might easily have been condensed into one-third of the space it now occupies. Counsel were properly informed some months ago that the case was not prepared according to the rules, and that we should not attempt to examine it until these rules were complied with, and a proper abstract made. But in an informal way we were given to understand by some of the counsel engaged in the cause, that it was really impracticable to condense the evidence and abridge the case, and therefore we concluded to examine it as it is. And after such examination we feel confident that the case might have been and should have been greatly abridged and condensed as the rules of court require. Unless this is done in the future, we shall ourselves enforce the rule by peremptorily dismissing causes in which no proper case is prepared as the rule requires.

Coming now to the merits of the case, we find no disagree-

ment between counsel as to the legal principles which must control the decision. The plaintiffs ask that the sale be set aside because it was procured through fraud and abuse of trust relations, and because advantage was taken of these confidential relations to consummate it, and to gain an advantage over the weak, helpless and ignorant by the experienced and strong. If the evidence sustains this view, there can be no doubt that the plaintiffs are entitled to the relief they seek. For the rule is familiar and almost axiomatic, that where parties occupy with respect to each other peculiar relations in which confidence is necessarily reposed by one party and influence is acquired by the other, all transactions and dealings between them are watched by courts of equity with more than ordinary jealousy to see that such confidence is not betrayed. Such courts always take into account all the circumstances, and the situation of the parties dealing with each other; and especially is this true where the party imposed upon is an infant or is *inops consilii*. Fraud is so various in its nature and so extensive in its application to human concerns, that it has been found impossible to give a full definition of it, but "in the sense of a court of equity," says Mr. Justice STORY, "it properly includes all acts, omissions, and concealments which involve a breach of legal or equitable duty, trust or confidence, justly reposed, and are injurious to another, or by which an undue and unconscientious advantage is taken of another." 1 Story's Eq., § 187. "The line between actual and constructive fraud can not be accurately drawn" in all cases; but an agreement, to be valid, must be freely entered into by the parties, and there must be no concealment of material facts, and no surreptitious advantage taken by the intelligent and strong over the unwary and ignorant. If we apply these very elementary and generally recognized principles of equity to the facts of this case, it seems to us plain that the contract must be set aside. Indeed it would be a scandal and reproach to a court of equity to sanction the

sale of this patent and of the right of extension, so far as the infant heirs are concerned. The evidence in this case is too voluminous to admit of any general discussion upon it, and we shall therefore content ourselves by stating the conclusions which we think it warrants. And it seems to us an irresistible conclusion from this testimony, that the rights and interests of those infants in a valuable patent were sacrificed for a mere pittance. The administrator, *John Benedict*, who made the sale on behalf of the estate, was the brother-in-law of *Barnum*, to whom the interest was transferred. Whether he was appointed in the first instance at the instigation and request of *Barnum*, as claimed by the counsel for the plaintiffs, in order to dispose of that interest in the manner he did, is an inquiry we will not make. It is sufficient for our purpose to say that when he took the administration of that estate, he assumed a trust, and the law imposed upon him the duty of using his best exertions to dispose of the interest in the patent to the best possible advantage for the estate. Did he make any exertions whatever to sell this interest to any one but his brother-in-law? Did he confer with any one engaged in the manufacture of these seamless thimble skeins, even in his own city, to see what they would be willing to give for that interest? He did nothing of the kind. It is true, he says he asked Whittaker what he would give for the patent and the extension; but this is all he did do. And when he obtained the license to sell that interest, he must needs make a private sale, without even advertising the property to be sold. The excuse for all this is, that the patent was about expiring, and that he had no means belonging to the estate to pay the expenses which would be incurred in obtaining its extension, and that *Barnum* was the only one who offered anything for the interest of the estate. But how did he know that this was the only disposition he could make of that interest — that no arrangement could be made with the manufacturers of those seamless thimble skeins in Kenosha and Chicago, by which the expense of

obtaining an extension of the patent could be defrayed? It was his duty to protect the interests of the estate in the matter; and it is impossible to say that he was vigilant in the execution of his .trust. And these remarks apply with equal if not greater force to the acts and conduct of the defendant *Thomas English.* He undertook to act as guardian of these minor children — to make contracts for those laboring under disability, and who were incapable of making contracts for themselves; and, having assumed this relation, he was bound to see that no undue advantage was obtained over those whose interests were entrusted to his care. We shall not dwell upon the fact disclosed in the evidence that an independent agreement was entered into between him and *Barnum,* in and by which the latter was to pay *English,* " *his heirs and assigns,*" $400 out of one fourth of the net profits realized from the patent. It is said in explanation of this agreement, that it was really intended for the sole benefit of the plaintiffs, and that the money was not to belong to *English.* It is a most suspicious circumstance, however, if this was the object of that agreement, that the contract of the same date in which the interest of all the heirs was transferred to *Barnum,* does not refer to it or state that the heirs were to have this money when paid. Why this distinct agreement was made at all, if the suggestion is true that the parties intended that the plaintiffs should have the benefit of it, is really more than I can comprehend. But, assuming that this was not a corrupt agreement, still there is abundant evidence that he failed to guard and protect the rights of his wards as he should have done. And we may observe here, that from the commencement of the negotiations in August, 1870, about buying the interest of the heirs in the patent and in the right of renewal, *Barnum* was informed all about the situation of the family of the patentee;— that the mother was dead — the children poor;— that some of them were minors, and that they had not the means of paying the expense of obtaining an extension. And he knew in Novem-

ber, when the agreement between him and *English* was consummated, by which the latter undertook to sell the interest of the heirs, that *English* had no authority to act for the minor children. He bargained, therefore, so far as the interest of these children was concerned, with his eyes open, knowing of their minority; and he will not be permitted to obtain and hold an undue and unconscientious advantage over them. It is not important to inquire whether he really meditated the commission of a fraud upon them or not. For the authorities all concur in holding that fraud will sometimes be presumed from the condition and circumstances of the parties contracting; and this rule applies with all its vigor to a case like the one we are considering, where one party is an able, intelligent patent-right agent, and the other party are ignorant and truly defenseless minors.

The sale of the interest of the two adult heirs, *Mary* and *Catherine*, stands upon somewhat different grounds; but even in respect to them I think the contract invalid. They gave their uncle, *Thomas English*, a power of attorney, authorizing him to sell all their title and interest in the patent upon such terms and for such consideration as should seem to him just and equitable. But it is obvious that they did not know the condition of the patent, and supposed that it had expired; they were ignorant of the real facts, and acted wholly upon the representations of *English*, that *Barnum* was willing to give $100 for "their signatures," and that "*this was better than nothing.*" This is what *English* said to them, and they had no knowledge upon the subject. Indeed. in this transaction, as in other matters, they and the other children, except Andrew, relied implicitly upon the statements and advice of their uncle, and did not really exercise any judgment of their own. They did not even know what they had authorized him to sell by the power of attorney. Under these circumstances, it would be a surprise and an implied fraud to hold them to the contract which their attorney made. If they had understood the facts

of the case — the nature of the contract which their attorney was about to make,— much as they were under his influence, it is altogether probable that they would have revoked his authority.   And besides, it is a legitimate inference from the whole evidence that *Barnum* took advantage of *English* by reason of his superior ability and intelligence, or, as Catherine and Andrew expressed it to *Barnum,* according to the latter's testimony, *English* was "imposed upon and made a tool of " in the whole negotiations which resulted in the contract finally made.   This conclusion is inevitable upon the theory that *English* was honest, and did not intend "to defraud or injure the estate or the heirs," as he says.   The whole matter, from first to last, seems to have been managed by the administrator and by *English* according to the wish, if not dictates, of *Barnum,* as everything went as he desired.

In connection with these facts, another circumstance relied upon as furnishing strong and even conclusive presumption of fraud and imposition is, the grossly inadequate sum paid and agreed to be paid for the interest and title sold to *Barnum.* In answer to this argument, it is said by the counsel for the defendants, that this interest had no determinate value when the contract was made; that it was not a right that was *in esse;* and that consequently there was no inadequacy of consideration. We cannot assent to this view of the case.   To our minds, the fact is established as decisively as it can be by testimony, that the right which the estate had under the patent laws to apply for and secure an extension of the patent was valuable, and that the sum actually paid and agreed to be paid was not one-tenth of its value.   It is true that the original patent, issued to Andrew Leonard, deceased, had nearly expired, and that it was necessary for the administrator to make application to the commissioner of patents for its extension.   This was done, and the extension was granted in February, 1871.   Nor is the fact overlooked, that the inventor disposed of considerable territory in his lifetime to various parties — among them to the defendant

*Barnum*, who had the exclusive right to make and vend this improved method of making thimble skeins in the New England states, in New York, Pennsylvania and California — and the widow, as administratrix, in 1865, had disposed of all the remaining interest of the estate in the patent for the term for which it was granted. But then there was the right under the law to have the patent renewed upon a proper application and showing, and this right was valuable if the patent itself was valuable, as it appears this was. It is suggested that there was doubt whether the extension would be granted by the commissioner, and that this condition of the right and interest sold rendered their value speculative, conjectural and uncertain. But the parties had a right to presume that the commissioner would do his duty and grant the extension upon the requirements of the patent laws being complied with by the administrator. We do not understand that it was in the nature of a privilege, which the commissioner could capriciously grant or refuse, irrespective of the merits of the application. No one was more competent to make a just estimate of the value of the interest sold than *Barnum*. He was familiar with the patent laws and with the rules and regulations of the patent office, and knew just what it was necessary to do to secure an extension. In fact, he drew the papers used on the application before the commissioner, and attended to the matter on the hearing. It is said that the extension was opposed, and that it was quite problematical whether the application would be favorably considered. There was no serious opposition to the extension of the patent on the part of any one. Durand, Vanarsdale & Co., gave notice that they should oppose the extension, but they carried their opposition no further. As to the proceedings in the patent office, it appears that examiner Griggs reported against the application. But Clark and Thacher, examiners in chief, recommended and advised, not "*hesitatingly*," as counsel say, but decidedly and strongly, in favor of the extension of the patents, in respect both to the method and product; while Hodges "concurs in

Leonard and others vs. Barnum and others.

recommending that the patent to Andrew Leonard for his pro-
cess of manufacturing thimble skeins for wagons be extended,"
but advises against extending the patent on the product. The
commissioner granted the extension asked. This, in brief, is
the history of the proceedings in the patent office, and it shows
most conclusively that there was no uncertainty about the ex-
tension; and especially was this true when the sale of the in-
terest of the heirs in the patent was consummated, on the 24th
of January. So there was surely nothing in the condition of
the thing contracted for and sold which impaired its value. It
stood upon the same footing precisely as any other patent right,
to be determined by its value and importance as an invention
for manufacturing thimble skeins for wagons. Considering it
in this light alone, the testimony bearing upon the question
proves quite conclusively that the interest sold was worth sev-
eral thousand dollars. It would extend this opinion to an in-
convenient length to refer to the evidence upon which this con-
clusion is based. And it is sufficient for our purpose to say
that this fact is established most clearly and satisfactorily to
our minds. At all events, we think the defendants *Barnum*,
*English* and *John Benedict* were completely concluded by the
statements made in their affidavits which were used on the ap-
plication for the extension, from challenging the correctness of
the view expressed in respect to the actual value of the thing
sold. The inadequacy, therefore, of the price paid and agreed
to be paid is so great, when connected with the other matters to
which we have referred, that we have no hesitation in saying
the contract should be set aside. It affords the strongest
grounds for holding that an undue and unconscientious advan-
tage was taken by *Barnum* of the ignorance, weakness and ne-
cessities of the heirs in thus obtaining for $100 paid, and $400
to be paid contingently, their title and interest in a patent
which was intrinsically worth several thousand. This conclu-
sion results from the disparity in the consideration and the other
facts in the case bearing on the question of fraud.

It is idle to claim that *Barnum*, when he made the purchase, regarded the patent as of little value or utility. To be sure he said in his testimony that he did not consider it, outside the states of Wisconsin and Illinois, as "commercially worth one cent." But in the first interview with *English* in August, he says they talked "about the parties who were making or had made fortunes out of it." And it appears that he took pains to inform himself about the number of sets of these improved thimble skeins which were manufactured and sold in the United States annually; the profits of the business, and probable value of the royalty; he drew the affidavits of *Benedict*, *English* and others, used upon the application before the commissioner, where the value, importance and public utility of these seamless thimble skeins are made prominent reasons for granting the extension; and after the extension, in his conversation with Brown in Chicago, in which Brown offered him $1,000 for the states of Minnesota, Iowa, Missouri, Indiana, Michigan and Ohio, he says: "I told him that I could not, of course, accept that proposition." So he very well knew from the outset the value of the thing he was buying, and the ignorance and necessities of those with whom he was dealing. He seemed to claim that some consideration was due him from the heirs, because he assisted their father originally in obtaining the patent, and had lost considerable money in his efforts to introduce these skeins into public notice and use. But this does not justify him in taking advantage of the heirs and driving an unconscionable bargain with them. If he is paid all the moneys he expended on their behalf in obtaining the extension, with a reasonable compensation for his trouble and services about the matter, it is all that he can justly claim. This, under the circumstances, is all the relief a court of equity should grant him as the condition of setting aside the sale which was made to him by the administrator, and by *English* acting as attorney for the adult heirs, and as guardian for the minors.

The views above expressed dispose practically of the appeal

taken from that portion of the judgment which set aside the sale so far as the plaintiff *Andrew Leonard* was concerned. We know of no principle of law or morals which can be successfully invoked to sustain the sale of his interest. If his conduct in the matter is open to animadversion, as the counsel for the defendants claim, what, on the other hand, might not be very pertinently said about the acts of some of the defendants? But we refrain from further remark upon the subject. We will only add that if, for anything *Andrew* did or said during the negotiations, a court of equity would deprive him of his interest in the patent and the extension, it would certainly be after such a court had forgotten the maxims and principles upon which it acts.

*By the Court.* — So much of the judgment appealed from as sets aside the sale of the interest of *Andrew Leonard* in the patent, is affirmed. The judgment which dismisses the complaint in respect to the other plaintiffs is reversed, and the cause remanded with directions to enter a judgment setting aside the sale in respect to them and the infant defendant *Joseph Leonard*, upon their paying the defendant *Barnum* the moneys by him expended in procuring the extension of the patent, and reasonable compensation for his services.