**Peter M. ROBERTS, Plaintiff,**

v.

**SEARS, ROEBUCK AND CO., a corporation, Defendant.**

No. 69 C 2573.

United States District Court, N. D. Illinois, E. D.

May 31, 1979.

Louis G. Davidson, Chicago, Ill., for plaintiff.

Peter D. Kasdin, Arnstein, Gluck, Weitzenfeld & Minow, Chicago, Ill., for defendant.

## MEMORANDUM

LEIGHTON, District Judge.

This suit alleging fraud, breach of confidential relation, negligent misrepresentation, and unjust enrichment, is by Peter M. Roberts, a former employee, against the Sears, Roebuck Company, his former employer, for damages and rescission of a contract by which he assigned all his rights, including patents, to a quick release device for socket wrenches. A second amended complaint invoked the jurisdiction of this court on the ground that the parties are of diverse citizenship, and that the requisite jurisdictional amount is involved. Plaintiff prayed for rescission of the contract, return to him of certain issued patents, and for disgorgement of the unjust enrichment which allegedly had accrued to the defendant. The case was tried before a jury that returned three verdicts in plaintiff's favor, each for damages in the sum of $1,000,000 on his claims of wrongdoing by defendant.

Judgment was entered for plaintiff in the amount of $1,000,000, it being conceded that the verdicts were non-cumulative. Then, in a post-trial motion based on the jury's verdicts, plaintiff asked this court to grant him the equitable relief for which he had prayed, and payment to him of $44,000,000 by which, according to the evidence, defendant had been unjustly enriched through the use of plaintiff's property rights in the device he had invented. The motion was de-

nied, this court concluding that having submitted his claim for damages to a jury, the doctrine of election of remedies barred plaintiff from obtaining restitutionary relief. Both parties appealed.

The court of appeals approved the jury's findings, concluded that the three verdicts were proper, and affirmed the judgment in plaintiff's favor. It held, however, that it was error, in this instance, to apply the Illinois doctrine of election of remedies; and that while this court had "correctly decided not to disturb the jury's monetary award, . . . [it had] erred in not considering whether rescission of the contract and return of plaintiff's patents were appropriate." *Roberts v. Sears, Roebuck & Co.,* 573 F.2d 976, 985 (7th Cir.), *cert. denied,* 439 U.S. 860, 99 S.Ct. 179, 58 L.Ed.2d 168 (1978). Accordingly, that part of the court's judgment which denied equitable relief was reversed and remanded for a determination whether rescission is proper under the facts of this case.

The cause has been redocketed; the parties have stated their respective positions. They agree that no further evidence is to be heard; and that the mandate of the court of appeals can be complied with on a record which now consists of the pleadings, the evidence presented to the jury, the decision of the reviewing court, and the briefs of the parties stating their contentions. Therefore, the court will proceed to consider and decide whether under the facts of this case plaintiff is entitled to rescission of the contract by which he assigned to defendant all his rights to the quick release device for socket wrenches, including patents. A necessary starting point is a statement of the facts which must have persuaded the jury to return its verdicts.

### I.

Peter M. Roberts was born on January 18, 1945. When he was a 17 year old high school student, he worked part-time for the Sears, Roebuck Company in Gardner, Massachusetts. After finishing high school, he became a full-time sales clerk for the company. His education extended only to a high school diploma; and he did not have any business experience.

In 1963, while a minor 18 years of age, he worked on his own time and developed a quick release device that enabled the user of a wrench, with one hand, to change a socket of one size to one of another. He designed, tooled, and made a prototype of his invention. Then he had a Worcester, Massachusetts lawyer file an application on his behalf for a United States patent. Roberts knew that Sears, his employer, sold more than 1,000,000 wrenches each year. Therefore, he decided to show his invention, and the only prototype of it then in existence to the manager of the store in which he worked. Roberts was persuaded to submit his invention, along with the prototype, as a Sears employee suggestion to the company. Consequently, on May 7, 1964, the suggestion form which showed that a patent for the device was pending, and the prototype, were sent to the Sears main office in Chicago, Illinois. A short time later, Sears closed its Gardner, Massachusetts store; Roberts moved to Tennessee with his parents.

Roberts did not hear from Sears concerning his employee suggestion or about the evaluation of his invention. On one occasion he called Sears Chicago office long distance and spoke to a woman who seemed to be familiar with the subject; he wrote a letter on January 5, 1965 seeking information about the status of his suggestion, but he received no response. Then, sometime around the end of January 1965, while at his place of employment in Newport, Tennessee, he received a telephone call from Leonard Schram, a Sears attorney, who asked for the name of the lawyer who was processing the patent application for Roberts. After answering Schram's question, Roberts asked him, "what was happening with my device and he said that they were looking into it with some interest and they might be interested in it on some parts of their lines. . . ." Roberts then asked Schram what Sears had concluded about the invention's value; but, "he wouldn't give me an answer. He just said, 'Well,

sometimes inventors get more for their ideas than they are really worth, or try to get more for their ideas than they are really worth,' and that if he was interested, he would let me know." Schram, although he knew what Sears had done with the prototype of Roberts' invention since it was received in May 1964, did not tell Roberts the facts, nor the real reason for the telephone call.

In April 1965, through the Massachusetts lawyer, Sears wrote to Roberts and began negotiations for a license to use the quick release device. In letters written by Schram, the company stated that, in its judgment, the invention was not new; that any claim granted on the patent application would be "quite limited"; that the cost of adding the quick release feature to its wrenches would be 40¢ to 50¢ for each unit, and that in its appraisal, Roberts' invention as a feature on a Sears wrench would sell only to the extent that it was promoted. Therefore, a license for its use was worth $10,000. Sears' agents knew that Roberts trusted the company for which he had worked; and they expected him to accept as true the representations they were making in the effort to purchase a license for his quick release feature. Roberts, relying on what was transmitted to him from Sears by the Massachusetts lawyer, accepted as true the representations which had been made. On June 15, 1965, as far as he was concerned, the negotiations with Sears were concluded when he signed a memorandum agreement, the contract at issue in this case.

This agreement was prepared by Sears' lawyers; it was signed by Roberts when he was still a minor.[1] Its contents and their legal meaning were never explained to him; he did not employ an attorney in Tennessee where he was then living. He relied on what the Massachusetts lawyer told him; but unknown to Roberts, Sears had employed that lawyer, while he was purportedly acting for Roberts, to protect the company's interests with regard to certain patents

Sears anticipated would be issued for the quick release device. The agreement, as it was worded, was not one for a license, as had been first proposed by Sears; it provided for an assignment to Sears of all of Roberts' rights in his invention, including worldwide patent protection. It contained language suggesting that Sears did not expect to sell more than 50,000 wrenches with the feature in any year; it provided against the contingency that a patent would not issue on the Roberts' application. The total amount Roberts was to receive for his invention was $10,000, payable in a 2¢ royalty per unit.

Roberts entered into the memorandum agreement totally ignorant of what Sears had done in determining the value of his invention. He was not informed of relevant and important facts which were known only to Sears and its agents. Contrary to the impression Schram created when he told Roberts that the company was "looking into it [the device] with some interest and . . . might be interested in it on some parts of [its] lines . . .", the company had thoroughly explored and investigated the value of the quick release feature. Virtually on receiving the prototype of the invention in May 1964, Sears had it examined, and through experts at its disposal became convinced it was a highly marketable and valuable item. Copies of the prototype were immediately made. One of the questions raised by those responsible to Sears for the marketing of wrenches was whether Roberts' insertion of the release feature weakened a wrench to the extent that it could not stand use by a mechanic. Therefore, Sears' custom manufacturer of wrenches was requested to subject a copy of the prototype to physical tests. And in order to determine market acceptance of the new invention, a number of garage mechanics were asked to use one. These steps were taken in the summer and late fall of 1964. The physical tests proved that Roberts' modification of the ratchet wrench with his feature was usable; the

1. This fact was known to Sears because in Roberts' personnel file was his original employ- ment application in which he had told Sears his date of birth.

market test established that mechanics would be enthusiastic in welcoming what was a unique solution to a problem that had long burdened users of socket wrenches. Sears, through experts in the several fields, knew all of these facts long before Schram called Roberts late in January 1965.

Indeed, during the month of October 1964, based on tests that had been conducted for it, Sears ordered the incorporation of Roberts' quick release device into a completely new line of "fine tooth" ratchet wrenches then being developed for its market. Arthur Griesbaum, Sears' senior buyer for mechanics' tools, and the company's most knowledgeable employee concerning the marketing of such items, early expressed the view that Roberts' invention could be built into Sears' traditional style wrenches at "very little additional cost." Griesbaum and Schram had exchanged information on this subject before Schram called Roberts in Newport, Tennessee.

In fact, while Sears was negotiating with Roberts, it directed the manufacturer of its wrenches to incorporate the quick release feature into models that constituted 74.27% of the approximately 1,000,000 wrenches it sold annually. Thus, early in 1965, while downgrading its value, Sears negotiated for Roberts' invention knowing it was useful, highly promotable, and would most likely be profitable. The company anticipated that sales in the first year alone would total 750,000 units. This figure was quite in contrast with the language of the contract Roberts was asked to sign, an agreement which suggested that 50,000 wrenches was the limit Sears expected to sell in any one year with the Roberts' invention. In addition, while Sears was telling Roberts that the cost of inserting the quick release feature in its wrenches was going to be approximately 44¢ per unit, the company knew, before Roberts signed the memorandum agreement in June 1965, that the cost per unit was going to be approximately 20¢; and that, in contrast with its representations, the quick release feature was going to be relatively inexpensive to manufacture. As to the prospects of the patent, Sears had learned from the Massachusetts lawyer in February 1965 that the invention was patentable; it had the advice of its own patent attorneys on the prospects of patentability; and before the memorandum agreement was prepared by lawyers for Sears, the company had been informed that the claims of Roberts' patent application had been allowed by the United States Patent Office. Therefore, language in the memorandum agreement signed by Roberts hedging against the possibility that a patent would not issue was contrary to the facts known by Sears and its lawyers.

Within days after Roberts signed the memorandum agreement, although Sears represented it did not expect to sell more than 50,000 wrenches with the feature in any year, more than 44,000 wrenches with the quick release device incorporated were being manufactured per week. On each wrench was the number of the patent that issued on Roberts' application. Within three months after Roberts signed the agreement, Sears was marketing wrenches with the quick release feature, advertising this new invention as a tremendous breakthrough in the use of socket wrenches. Within nine months after reaching agreement with Roberts, Sears had sold more than 500,000 wrenches with the quick release feature; thus, it was able to pay Roberts all of the $10,000 in royalties called for under the memorandum agreement.

After receiving the last payment, Roberts executed assignments which had been prepared by Sears' lawyers, conveying to the company all his right, title and interest in his quick release invention, including those governed by the laws of foreign countries, foreign patent protection, and any patents which had issued, or might thereafter issue. Then he did military service in the United States Air Force, and was stationed in England until 1969. Roberts sought legal counsel concerning his contract with Sears while on military duty; but he was informed by Air Force lawyers that they were unable to assist him; their advice was that he seek legal advice on return to the United States. Roberts returned to this country, sought legal advice, and thereafter, served notice

on Sears of his election to rescind the June 15, 1965 agreement and have returned to him the issued patents. The money he had been paid was tendered to the company; it was refused, and this suit followed.

In the trial of the case, the jury heard evidence bearing on the material facts which showed that from 1965 to December 31, 1976, Sears earned an incremental profit of $44,032,082 from the sales of its wrenches with Roberts' quick release feature. The parties argued their respective contentions and filed written requests for instructions on the applicable rules of law. The court passed on these requests; it instructed the jury that based on his allegations and proof, Roberts was asserting three claims against Sears. The first was that his former employer defrauded him of his rights to the quick release device he had invented; the second, that his former employer breached the confidential relation between them, one that arose out of the pre-existing relationship of employee and employer, the trust he had placed in Sears; the third, that his former employer had engaged in negligent misrepresentations concerning its knowledge of the value of his invention, the invention's potential sales, and its public acceptance.

The jury deliberated and then returned three separate verdicts in favor of Roberts on his three claims. It assessed damages on each in the sum of $1,000,000. Thereafter, Sears filed a post-trial motion for judgment notwithstanding the verdicts or, alternatively, for a new trial. After hearing the parties, this court denied the motion and entered judgment.

## II.

It is a rule of general acceptance that "[a]n order denying a new trial leaves the findings of the jury intact; it imports findings of fact consistent with the action taken, and constitutes in effect a determination by the trial court that the weight of the evidence justified the verdict." 66 C.J.S. *New Trial* § 210b(1) (1950); *compare McDonald v. Risch,* 41 Ill.2d 242, 242 N.E.2d 245 (1968). Therefore, when this court denied the motion for a new trial, it implicitly made findings of fact consistent with the verdicts that had been returned, verdicts by which the jury concluded [2] that Sears committed fraud on Roberts in the way it acquired all of his rights to the quick release device he invented; that Sears breached the confidential relation that existed between Roberts and the company, one that arose out of a pre-existing relationship of employee and employer; and that Sears, in its negotiation for the quick release device committed negligent misrepresentations concerning the company's knowledge of the invention's value, its saleability, and its public acceptance.

This is a case in which federal jurisdiction was invoked on the ground of diversity of citizenship of the parties. Therefore, the substantive law of Illinois as well as its applicable conflicts of laws decisions are controlling. *Hartford Accident & Indemnity Co. v. Crider,* 392 F.Supp. 162, 167 (N.D.Ill.1974). In Illinois, the elements of fraud which would justify rescission of a contract by a suit in equity are the same as those which would sustain an award of damages in an action at law. *Welch v. Brunswick Corporation,* 10 Ill.App.3d 693, 698, 294 N.E.2d 729, 732 (1st Dist. 1973). It is the law in Illinois that where the subject matter of a contract is acquired through fraud, *Wiebrecht v. Shapiro,* 54 Ill.2d 527, 301 N.E.2d 293 (1973); *MacAuley v. Rickel,* 96 Ill.App.2d 283, 238 N.E.2d 603 (2d Dist. 1968); or through the breach of a confidential relation, *Swiney v. Womack,* 343 Ill.

---

**2.** Where jurisdiction is founded on diversity of citizenship, and state-created rights are sought to be enforced in a federal court, a general verdict will be construed as the forum state would construe it. In this case, then, the verdicts of the jury are to be construed liberally with the view to effectuating its intention, if that is possible, *Churchill v. Norfolk & W. Ry.*

Co., 46 Ill.App.3d 781, 5 Ill.Dec. 885, 362 N.E.2d 356 (4th Dist. 1977); and in doing so, reference should be made to the entire proceedings, including the pleadings, instructions and evidence. *Martin v. McIntosh,* 37 Ill.App.3d 526, 346 N.E.2d 450 (5th Dist. 1976). It is in this way that this court has deduced the conclusions of the jury in the verdicts it returned.

278, 175 N.E. 419 (1931); or through misrepresentation, *Douglass v. Treat,* 246 Ill. 593, 92 N.E. 976 (1910); rescission, as a remedy, is available through an action in equity. When this remedy is sought, it is to declare an agreement void from its inception. *Farmers Automobile Insurance Ass'n v. Pursley,* 130 Ill.App.2d 980, 985, 267 N.E.2d 734, 737–38 (5th Dist. 1971). The right to this form of equitable relief may be brought about either by operation of law, by agreement of the parties, express or implied; "or, it may come into being as a right at law arising from the conduct of the other party." *Bowser, Inc. v. Hamilton Glass Co.,* 207 F.2d 341, 343 (7th Cir. 1953).

█ Equity jurisprudence of Illinois is not radically different from that of other American jurisdictions. Thus, in *Operative Service Corporation v. McIntyre Pump Co.,* 85 Colo. 519, 277 P. 773 (1929), the decision of the Supreme Court of Colorado was consistent with that of the Supreme Court of Illinois in *Hicks v. Stevens,* 121 Ill. 186, 11 N.E. 241 (1887), both courts holding that an assignment or contract for the sale of a patent or interest therein may be rescinded or cancelled in equity where recognized equitable grounds therefor exist. *Compare Nicholalds v. McGlothlin,* 330 F.2d 454 (10th Cir. 1964); *see* 69 C.J.S. *Patents* § 241b(1) (1951); 4 Deller, Walker on Patents § 379 (2d ed. 1965). In *Page v. Dickerson,* 28 Wis. 694 (1871), the Supreme Court of Wisconsin had before it a case like the one ruled on by the Illinois Supreme Court in *Hicks v. Stevens* and, applying the same equity principles, reached the same result. Later, in *Leonard v. Barnum,* 34 Wis. 105 (1874), the court had before it a contract for the sale of rights to a patent; the controversy gave rise to factual issues similar to those resolved by the jury in this case. Referring to the fact that some of the plaintiffs were minors, and to allegations of fraud similar to those found in plaintiff's complaint in this case, the Wisconsin court said,

"[T]he rule is familiar and almost axiomatic, that where parties occupy with respect to each other peculiar relations in which confidence is necessarily reposed by one party and influence is acquired by the other, all transactions and dealings between them are watched by courts of equity with more than ordinary jealousy to see that such confidence is not betrayed. Such courts always take into account all the circumstances, and the situation of the parties dealing with each other; and especially is this true where the party imposed upon is an infant or is *inops consilii.*[3] Fraud is so various in its nature and so extensive in its application to human concerns, that it has been found impossible to give a full definition of it, . . . ." 34 Wis. at 109.

The contract in the case was ordered rescinded.

The Supreme Court of Oregon, also in a case involving a contract for the sale of patent rights, reached the same result in *Paulson v. Kenney,* 110 Or. 688, 224 P. 634 (1924). *Lederer v. Yule,* 67 N.J.Eq. 65, 57 A. 309 (1904), was an instance where a New Jersey court of equity, because of fraud and misrepresentation, granted rescission of a contract for the sale of rights to a patent. In *Goldsmith v. Koopman,* 140 F. 616 (S.D. N.Y.1905), a federal court had before it a complaint to set aside an assignment of rights to an invention protected by United States and foreign patents. The grounds alleged were fraud, breach of a confidential relation, and misrepresentation. The district court, relying on principles of equity analogous to those of Illinois, decreed rescission of the transaction and granted restitutionary relief. 140 F. at 621.

### III.

█ There is no reason why a different result should be reached in this case. The mandate of the court of appeals directed this court to consider whether here, on the

---

**3.** This phrase means a person without the aid of counsel. In the case of persons *inops concilii* and illiterate, the law will especially favor them in the construction of any deed they execute, applying liberally the rules of conveyance. *See Davenport v. Wynne,* 28 N.C. 128, 44 Am. Dec. 70 (1845).

facts shown in the record, rescission is appropriate. After reviewing the pleadings, the evidence, the prior rulings, and applying the controlling principles of equity, it is this court's judgment that Roberts is entitled to a decree rescinding his June 15, 1965 contract with Sears. Therefore, a decree of rescission will be entered.

## IV.

Rescission is the termination of a contract with restitution. *Horan v. Blowitz,* 13 Ill.2d 126, 148 N.E.2d 445 (1958); I.L.P. *Contracts* § 341 (1955). It is an equitable doctrine, a form of equitable relief. *Hakala v. Illinois Dodge City Corp.,* 64 Ill. App.3d 114, 21 Ill.Dec. 1, 380 N.E.2d 1177 (2d Dist. 1978); *see* Leighton, Elements of Equitable Relief, 2 J.Mar.J. of Prac. & Proc. 230, 250–253 (1969). When it is sought and granted for fraud, an Illinois court of equity usually grants the defrauded party the full remedy to which, under the circumstances, he may be entitled. *Van Koten v. Van Koten,* 323 Ill. 323, 154 N.E. 146 (1926); 37 Am.Jur.2d *Fraud & Deceit* § 338 (1968). The courts of Illinois recognize the general rule that

> "[t]he essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims." *Hecht Co. v. Bowles,* 321 U.S. 321, 329–30, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944).

*See First National Bank v. Bryn Mawr Beach Bldg. Corp.,* 365 Ill. 409, 6 N.E.2d 654 (1937). For these reasons, in this case, rescission having been decreed, restitutionary relief will be granted with the court bearing in mind the competing claims of Roberts and Sears to the subject matter of the rescinded contract.

First, Sears will be ordered to reassign to Roberts, his successors, legal representatives or assigns, all right, title and interest which the company acquired from him, in and to United States Letters Patent No. 3,208,318 and Letters Patent of Canada No. 757,826, both patents issued to Roberts on September 28, 1965 and May 2, 1967, respectively, for an invention relating to a quick release device for socket wrenches. Within 10 days after the entry of the rescission decree, the two patents, divisions, reissues or extensions thereon obtained or to be obtained by Sears in the United States or in any foreign country, and the executed assignments of each patent, shall be delivered to H. Stuart Cunningham, Esq., Clerk of this court. Thereafter, the Clerk is directed to allow Roberts and his counsel a reasonable period of time to examine the patents, the assignments, and all documents pertaining thereto; and upon their expressing satisfaction that all have been delivered in compliance with the decree, the parties, on a day to be set, will appear in open court for delivery and acceptance of the documents, and in order to record satisfaction of this portion of the rescission decree. Looking to the possibility that Sears will not perform these specific acts, the decree will contain provisions invoking the in rem powers of this court sitting in equity. *See* Rule 70, Fed.R.Civ.P.; Leighton, Development of In Rem Powers of Courts of Equity, 5 Nat. Bar J. 1 (1947).

However, return of the patents to Roberts has in fact been suggested by Sears. A short time after this case was docketed on remand, Sears offered to make the reassignment and delivered proposed drafts to Roberts through his lawyers in this case. The offer was rejected because Sears' proposed assignments did not include returning to Roberts the right to recover damages and profits, due or accrued, arising out of past infringements of the patents, if any there have been. In the judgment of this court, Roberts is correct in insisting that reassignments of the two patents include his right to recover for past infringements, and for damages and profits due or accrued on the patents. Therefore, the terms of the reassignments will be in accordance with

those contained in Appendices "A" and "B" which will be attached to the decree.

Second, Sears will be ordered to account for and pay to Roberts all of the profits it has earned from the use of the quick release device, from May 7, 1964 when it acquired the prototype to the present.[4] Sears argues that this court cannot order it to account for its profits from Roberts' invention because the court of appeals' mandate specifically limited jurisdiction on remand to whether rescission is an appropriate remedy in this case; and if so, the return of the patents to Roberts. The argument relies on language in the reviewing court's opinion which Sears contends restricts Roberts only to the relief of having his patents returned to him in the event rescission is granted by this court. Roberts, of course, argues to the contrary. He insists that rescission, in the proper case, means more than restitution of the property obtained by fraud; and, insisting that this is such a case, he argues that rescission may require an accounting and disgorgement of any unjust enrichment.[5]

This court has studied the opinion of the court of appeals knowing full well that an inferior court is bound by the mandate of the superior one, and must carry its directions into execution. *Sibbald v. United States,* 37 U.S. (12 Pet.) 488, 9 L.Ed. 1167 (1838); *Briggs v. Pennsylvania R. Co.,* 334 U.S. 304, 306, 68 S.Ct. 1039, 92 L.Ed. 1403 (1948); *see United States v. Fernandez,* 506 F.2d 1200, 1202 (2d Cir. 1974). It is clear, however, that the mandate in this case does not have the restriction argued by Sears. Certainly, the court of appeals did not say that rescission means one thing for Roberts and another for other litigants. The language to which reference is made was used by the court when it discussed the consideration the jury must have given to Sears' profits from Roberts' invention when damages on the three claims were awarded. The jury was instructed that "[i]f you find in favor of the Plaintiff . . . then, one of the elements of the money damages to be considered by you . . ." was Sears' profits. Concerning Roberts' first and second claim: fraud, and breach of confidential relation, the jury was told that "[t]he award of money damages you make may equal the net profits which you find the Defendant gained as a result of its merchandising of wrenches incorporating Plaintiff's quick release invention and idea. . . . ." In each of its three verdicts, the jury stated that "we assess damages in favor of plaintiff, which we find to be in the sum of $1,000,000." Thus it appears that for the injury inflicted on him by Sears; that is, the fraud, the breach of confidential relation, the misrepresentations, and the twelve years of worry about his invention and his rights in it, the jury awarded Roberts damages in the sum of $1,000,000. *See* 1 C.J.S. *Actions* § 15a (1936); 25 C.J.S. *Damages* §§ 1, 2 (1966).

Damages, as that term is ordinarily used, mean simply a measure of injury. *Kozar v. Cheasapeake & O. Ry. Co.,* 449 F.2d 1238, 1240 (6th Cir. 1971). The purpose of damages is to place the injured person in the same position, so far as money can do it, as he would have been had there been no injury or breach of duty; that is, to compensate him for the injury actually sustained. *Lee v. Southern Homes Sites Corp.,*

---

**4.** The accounting will necessarily include a report by Sears of its stock of ratchet wrenches with Roberts' quick release device incorporated, and the profits which can be anticipated from their sales. Sears is not to order any further manufacture of such wrenches after the date of the decree of rescission. Wrenches to be delivered on contracts of manufacture entered into in the past will have to be the subject of supplemental orders to be entered by this court. Appropriate orders governing further discovery will also be entered.

**5.** It is unnecessary to repeat the jury's findings that Sears acquired Roberts' invention by fraud, breach of a confidential relation, and negligent misrepresentations. This court approved those findings when it denied Sears' motion for a new trial. The court of appeals affirmed, saying that "[t]his case involves the efforts of one of this nation's largest retail companies, Sears, Roebuck & Co. (Sears), to acquire through deceit the monetary benefits of an invention of a new type of socket wrench created by one of its sales clerks during his off-duty hours." *Roberts v. Sears, Roebuck & Co.,* 573 F.2d at 978.

429 F.2d 290 (5th Cir. 1970). Being compelled to disgorge money by which one has been unjustly enriched is different from being compelled to pay damages.

The terms "restitution" and "unjust enrichment" are modern designations for the older doctrine of "quasi contracts" *Hixon v. Allphin,* 76 Idaho 327, 281 P.2d 1042, 1045 (1955). The doctrine of unjust enrichment is an equitable one; damages is a legal remedy. 22 Am.Jur.2d *Damages* §§ 1, 2 (1965). In awarding damages, the law seeks to make the injured party whole, as far as money can; in applying the doctrine of unjust enrichment and compelling disgorgement, where property is fraudulently obtained through a contract, equity seeks to

> "require the wrongdoer to restore what he has received and thus tend to put the injured party in as good a position as that occupied by him before the contract was made." 5 Corbin, Contracts § 1107, at 573 (1964).

In Illinois, it has long been the law that where the right to rescind a contract exists, the person with the right is entitled to an accounting of the profits made from the property conveyed, and an adjustment of the equities between the parties. *O'Halloran v. Fitzgerald,* 71 Ill. 53 (1873); *Corzine v. Keith,* 384 Ill. 435, 51 N.E.2d 538 (1943); *Doom v. Doom,* 8 Ill.App.3d 186, 289 N.E.2d 243 (4th Dist. 1972).

In this case, the accounting by Sears of its profits from Roberts' invention and a determination of the sum of money by which it has been unjustly enriched are to be made at a hearing to be conducted by this court. Roberts argues against such a hearing. He contends that he presented evidence to the jury, much of it uncontroverted, which proved that up to and including December 31, 1976, Sears had earned an incremental net profit of $44,032,082 from its use of his invention. Net incremental profit is the additional earning Sears made in excess of the profit it obtained on a ratchet wrench without the quick release device, less the additional cost incurred by incorporating the feature. These being the facts, Roberts insists that this court should order Sears to pay him the net incremental profits it has earned from his invention, less the $1,000,000 jury award. As to the period from January 1, 1977, concerning which Sears has not disclosed the amount of its sales and profits, Roberts argues that the accounting should be referred to a magistrate to sit as a master, hear evidence, determine the extent of Sears' unjust enrichment, and recommend a disposition.

The court does not agree. Roberts' proof of Sears' profits was made to the jury for the purpose of establishing a basis on which damages could be awarded. The accounting which Sears will be required to make is for the purpose of determining the amount of money by which it has been unjustly enriched through its use of an invention it acquired by fraud, breach of a confidential relation, and negligent misrepresentations. When Sears defended Roberts' claims before the jury, it was not called on to defend a charge that it had been unjustly enriched, and thus be called upon to disgorge profits it had made out of the quick release device.

Therefore, this court will hold the accounting hearing. It is familiar with this case and with the nuances of the issues involved. For these reasons, it would be a waste of judicial resources for either a magistrate or a master to undertake the hearing that will be required. Roberts, of course, can rely, if he desires, on the evidence he presented to the jury; he can also point to his proof of the net incremental profit he claims Sears has earned. Whether by the accounting it will be determined that the amount he is entitled to receive from Sears is $44,032,082, reduced by the $1,000,000 jury verdict, is a matter to be seen. In any event, the accounting hearing will vindicate the principle that equity will not permit a person to derive any benefit from a fraud perpetrated by him. *Duncan v. Dazey,* 318 Ill. 500, 525, 149 N.E. 495 (1925); *Callner v. Greenberg,* 376 Ill. 212, 33 N.E.2d 437 (1941); *compare Goldsmith v. Kooperman,* 152 F. 173 (2d Cir. 1907).